**Obermayer Rebmann Maxwell & Hippel LLP**
By:     Matthew Green, Esq. (03228-2003)
        Ivo Becica, Esq. (01240-2007)
1120 Route 73, Suite 420
Mount Laurel, New Jersey 08054
(856) 857-1413
matthew.green@obermayer.com
ivo.becica@obermayer.com
*Attorneys for Plaintiff, Sunbelt Rentals, Inc.*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **Plaintiff:**<br><br>**SUNBELT RENTALS, INC.**<br>2341 Deerfield Drive<br>Fort Mill, South Carolina 29715<br><br>vs.<br><br>**Defendant:**<br><br>**MICHAEL LOVE**<br>100 South Newport Drive,<br>Napa, California 94559 | Hon. Renee Marie Bumb, U.S.D.J.<br><br>Case No.:  20-17611-RMB-AMD<br><br>**CIVIL ACTION**<br><br>**SECOND AMENDED VERIFIED COMPLAINT AND JURY DEMAND** |

Plaintiff, Sunbelt Rentals, Inc. ("Sunbelt"), by and through undersigned counsel, by way of a Second Amended Verified Complaint against Defendant, Michael Love ("Defendant"), avers as follows:

**NATURE OF THE ACTION**

1.      This is an action for equitable and legal relief based on Defendant's breaches of a non-competition agreement, confidentiality agreement, and other contractual provisions designed to prevent Defendant from unfairly competing with Sunbelt and misappropriating Sunbelt's confidential and valuable trade secrets.

2.      Upon information and belief, EquipmentShare.com Inc. ("EquipmentShare") has devised and set into motion a scheme to poach highly-skilled management from Sunbelt to its benefit in contravention of binding non-competition clauses to which these employees are subject.

3.      Specifically, upon information and belief, EquipmentShare recruits current and former Sunbelt employees who possess knowledge and information regarding Sunbelt's confidential sales and business development strategies.

4.      Defendant, for example, was a highly compensated (over $300,000 annually) Sales Development Director for Sunbelt, who had access to Sunbelt's pricing information and business development strategies.

5.      While employed by Sunbelt and shortly before his resignation, Defendant began preparing to compete with Sunbelt through EquipmentShare by, among other things, e-mailing Sunbelt's confidential files and trade secrets to himself.

6.      Since beginning his employment with EquipmentShare, Defendant has expressed, in writing, his intent to compete nationally with Sunbelt.

7.      Compounding Defendant's egregious conduct is the fact that, just two years ago, upon information and belief, he received approximately $4,000,000 in the sale of Interstate Aerials, LLC, at which point he agreed not to compete with Sunbelt.  Defendant now wants to pilfer the customer contacts he sold to Sunbelt, thus having his cake and eating it, too.

8.      Given the quantity and nature of the confidential information Defendant possesses, the position he now holds with Sunbelt's direct competitor, EquipmentShare, and the potential competitive value of Sunbelt's trade secrets, it is clear Defendant has acted and will continue to act in violation of his contractual obligations and his legal obligations under federal and state law.

9. Defendant's ongoing violations and wrongful conduct have caused and are causing irreparable injuries to Sunbelt, including to its relationships with customers, confidential and proprietary information and trade secrets, and good will and reputation in the industry and marketplace.

10. Accordingly, Sunbelt asserts the following claims against Defendant: (1) breach of contract; (2) violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*; (3) violation of the New Jersey Trade Secrets Act, N.J. STAT. ANN. § 56:15-1 *et seq.*; and (4) unjust enrichment.

11. Sunbelt "ha[s] the right to contractual[ly] bar its own senior officers from aiding its competitors surreptitiously and unfairly." *Aceton, Inc. v. Harns*, 2020 BL 438335, *9 (D.N.J. Nov. 6, 2020). This Court should enforce Sunbelt's contractual rights and enjoin Defendant from knowingly breaching his non-competition and confidentiality agreements.

## PARTIES

12. Sunbelt is a corporation organized under the laws of North Carolina with its principal place of business located at 2341 Deerfield Drive, Fort Mill, South Carolina 29715.

13. Upon information and belief, Defendant is a natural person residing at 100 South Newport Drive, Napa, California 94559.

## JURISDICTION AND VENUE

14. This Court has personal jurisdiction over Defendant because he irrevocably agreed, in the Employment Agreement (the "Agreement") that is presently at issue, to be subject to this Court's jurisdiction. In signing the Agreement, Defendant expressly waived any objections to personal jurisdiction. A true and correct copy of the Agreement is attached to this Complaint as Exhibit "A."

3

15.     This Court has original jurisdiction over this dispute pursuant to 28 U.S.C. § 1331, by virtue of Sunbelt's claim arising under the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*

16.     Furthermore, this Court has supplemental jurisdiction over Sunbelt's various state law claims set forth in this Complaint pursuant to 28 U.S.C. § 1367, as those claims form part of the same case or controversy as the other claims stated herein.

17.     Venue is proper in this district because Defendant agreed, in the Agreement that is presently at issue, that any action relating to the Agreement would be governed by and interpreted under the laws of the State of New Jersey and would be filed in the federal court sitting in Camden County, New Jersey.  In signing the Agreement, Defendant expressly waived any objections to venue.

## BACKGROUND FACTS

### SUNBELT'S HISTORY

18.     Sunbelt was founded in 1983 as a small rental company for general construction equipment.

19.     For over thirty-five years, Sunbelt has worked to develop relationships with clients, open locations throughout the United States, and distinguish itself from competitors through its pricing and system management.

20.     As a direct result of its commitment to developing its business, Sunbelt is now a national market leader in the extremely competitive business of renting and selling equipment, tools, climate control units, scaffolding, oil and gas equipment, and parts for use in the manufacturing, industrial, and construction industries.

4

21.     Sunbelt provides its services and equipment through a network of locations throughout the United States.  These locations (also referred to as "Profit Centers" abbreviated as "PCs") can be found by searching Sunbelt's website at www.sunbeltrentals.com/locations/.

22.     All of Sunbelt's revenue originates at its PCs, and therefore all sales and rental activities within Sunbelt are connected to the company's PCs.

## SUNBELT PURCHASES INTERSTATE AERIALS

23.     In August 2018, Sunbelt paid a sales price in excess of 200 million dollars to acquire a company named Interstate Aerials, LLC, ("Interstate Aerials")—a leading aerial equipment rental provider that served the greater Philadelphia market, as well as the northern New Jersey area.

24.     As part of the acquisition, Sunbelt purchased Interstate Aerials' assets, including its books of business, sales and marketing information and data, and other proprietary materials.

25.     In addition, in accordance with the terms of the acquisition agreement, Sunbelt hired several Interstate Aerials employees, including Defendant, who became Sunbelt employees.

26.     At the time of the acquisition, and according to Defendant's resume, Defendant served as the "Vice President of Sales/Shareholder" of Interstate Aerials.

27.     Given his position, Defendant signed an Employee Compensation Package with Interstate Aerials in 2007 that entitled him to 2.5 percent of the net sales price in the event Interstate Aerials was sold.  A true and accurate copy of this agreement is attached as Exhibit "B."

28.     Upon information and belief, therefore, Defendant received approximately $4,000,000 as a result of the acquisition.

## DEFENDANT BECOMES A SALES DEVELOPMENT DIRECTOR WITH SUNBELT

29.     Following the acquisition, Sunbelt hired Defendant as a Sales Development Director.

30.     Under his contractual agreement with Sunbelt, Defendant was to be compensated $300,000 per year and receive a one-time retention bonus in the amount of $250,000.

31.     As of October 16, 2020, Sunbelt had compensated Defendant more than $350,000 for one year.

32.     As a Sales Development Director, Defendant was responsible for transitioning his Interstate Aerials customers over to Sunbelt.

33.     Given this role and the attendant responsibilities, Defendant received various confidential business materials from Sunbelt, including, but not limited to, Sunbelt's pricing and business development information.

34.     In order to protect Sunbelt's legitimate business interests, Defendant entered into an Agreement at the start of his employment with Sunbelt on or about August 17, 2018, in which he agreed to noncompetition, nonsolicitation, and confidentiality covenants. *See generally* Exhibit A ¶ 5, pp. 3-5.

35.     Specifically, Defendant agreed that he would never:

> use, divulge, disclose, furnish, or make accessible to any third person, company, or other entity any aspect of Confidential Information, Intellectual Property . . . or Proprietary Materials . . . .

*Id.* ¶ 5.1, p. 4.

36.     Defendant also agreed that, during the term of his employment, and for one year following his separation from Sunbelt for any reason (the "Restrictive Period"), he would not compete in any manner:

> with the Corporation, its successors and assigns by engaging, directly or indirectly, in the Business as conducted at the Designated Stores or in a business substantially similar to the Business as conducted at the Designated Stores, within the "Territory," as hereinafter defined[.]

*Id.* ¶ 5.2.4, p. 4.

6

37.    Defendant also agreed that, during the Restrictive Period, he would not:

provide information to, solicit or sell for, organize or own any interest in (either directly or through any parent, affiliate, or subsidiary corporation, partnership, or other entity), or become employed or engaged by, or act as agent for any person, corporation, or other entity that is directly or indirectly engaged in a business in the "Territory" . . . , which is substantially similar to the Business as conducted at the Designated Stores or competitive with Corporation's Business as conducted at the Designated Stores; provided, however, that nothing herein shall preclude the Employee from (i) engaging in activities or being employed in a capacity that do not actually or potentially compete with Corporation's Business or (ii) holding not more than one percent (1%) of the outstanding shares of any publicly held company which may be so engaged in a trade or business identical or similar to the Business of the Corporation.

*Id.* ¶ 5.2.5, pp. 4–5.

38.    Defendant further confirmed that he would not:

provide or solicit the provision of products or services, similar to those provided by Corporation at the "Designated Stores" . . . , to any person or entity who purchased or leased products or services from Corporation at any time during [the Restricted Period] and for or with whom [Defendant] had contact, responsibility or access to Confidential Information related to such person or entity; provided, however, the restrictions of this Paragraph 5.2.2 shall be limited in scope to the "Territory" . . . .

*Id.* ¶ 5.2.2, p. 4.

39.    As noted in the Agreement, Sunbelt is engaged in the business of selling and renting

equipment, including but not limited to lift equipment.  *Id.* ¶ 5, p. 3.

40.    Moreover, as set forth in the Agreement, "Confidential Information" includes,

without limitation:

existing and future equipment information, customer lists, identities of distributors and distributorships, sales methods and techniques, costs and costing methods, pricing techniques and strategies, sales agreements with customers, profits and product line profitability information, unpublished present and future marketing strategies and promotional programs, and other information regarded by Corporation as proprietary and confidential . . . .

*Id.* ¶ 5, p. 3.

7

41.     The Agreement defines "Territory" as:

the geographical area within a fifty (50) mile radius of any of the Corporation's stores in which, **or in connection with which**, [Defendant] was assigned to at any time during the twelve (12) month period immediately preceding the termination or expiration of this Agreement for any reason (the "Designated Stores").

*Id.* ¶ 5, p. 5 (emphasis added).

42.     Upon execution of the Agreement, Defendant expressly acknowledged that Sunbelt held a legitimate business interest justifying the restrictive covenants, including, *inter alia*, because he would receive trade secrets and confidential information from the Corporation.  See *id.* ¶ 5, 10, pp. 4, 6.

43.     Upon signing the Agreement, Defendant further acknowledged that "all files, records, lists, designs, specifications, formulas, books, products, Confidential Information, Proprietary Materials, Intellectual Property and other materials owned and used by Corporation in connection with the conduct of its Business shall at all times remain the property of Corporation, and that upon termination or expiration of this Agreement or employment hereunder for any reason or upon demand by Corporation, Employee will surrender to Corporation all such materials."  *Id.* ¶ 7, p. 6.

## DEFENDANT'S EMPLOYMENT RESPONSIBILITIES FOR SUNBELT

44.     As the Sales Development Director for Sunbelt, Defendant was assigned by Sunbelt to a number of job duties with a national scope, including the responsibility for transitioning the following customers from Interstate Aerials to Sunbelt:

a.  PBF Energy, which is headquartered at 1 Sylvan Way, Second Floor, Parsippany, New Jersey 07054, and has locations in Delaware, Ohio, Louisiana, and California;

b.  Monroe Energy, LLC, which is located at 4101 Post Road, Marcus Hook, Pennsylvania 19061;

8

    c.    PSEG Facilities, which is headquartered at 80 Park Plaza, Newark, New Jersey 07102, and has several locations throughout the state;

    d.    Kiewit Corporation ("Kiewit"), which is headquartered at 3555 Farnam Street, Omaha, Nebraska 68131, and has locations in Alaska, Arizona, California, Colorado, Florida, Georgia, Hawaii, Illinois, Iowa, Kansas, Maryland, Massachusetts, Michigan, Minnesota, Nebraska, Nevada, New Jersey, New Mexico, New York, North Carolina, Oregon, Tennessee, Texas, Utah, Virginia, Washington, Wyoming, Mexico, and Canada;

    e.    APi Group, which has a location at 1100 Old Highway 8 NW, New Brighton, Minnesota 55112, and is a business service provider with over 200 locations worldwide and approximately 32 companies as part of its network;

    f.    Mobile Mini, which is headquartered at 4646 East Van Buren Street, Phoenix, Arizona 85008, and has over 150 locations in North America;

    g.    AMECO, which has its global headquarters in Greenville, South Carolina, and has locations in Texas and internationally;

    h.    Braskem, which is headquartered at 1735 Market Street, 28th Floor, Philadelphia, Pennsylvania 19103-7583, and has locations in Texas and internationally;

    i.    Superior Construction, which has two corporate offices located at 1455 Louis Sullivan Drive, Portage, Indiana 46368, and 7072 Business Park Boulevard North, Jacksonville, Florida 32256.

45.    During the last 12 months of Defendant's employment with Sunbelt, the above-referenced customers rented or purchased equipment through 393 different Sunbelt PCs in 45 U.S. states.

46.    In addition to transferring these customers, Defendant was assigned to help Sunbelt's National Sales Team develop relationships with customers across the United States.

47.    Although Defendant initially lived in Philadelphia, Pennsylvania and worked from an office in Paulsboro, New Jersey, Defendant's assigned role was national in scope, as he had overall responsibility in the geographic locations set forth above and elsewhere.

48.    Indeed, Defendant has expressly acknowledged that his assignment was national in scope.

49.     In his updated resume, Defendant described his role with Sunbelt as involving "acquisition transition/national and industrial sales."   A true and correct copy of Defendant's updated resume is attached as Exhibit "C."

50.     Thus, although Defendant relocated to Napa Valley, California in July 2019, his job duties did not change.  After the move, Defendant was still assigned to facilitate, on Sunbelt's behalf, rentals and sales by large customers across the United States.

**DEFENDANT FORWARDS SUNBELT'S CONFIDENTIAL INFORMATION FROM HIS WORK E-MAIL ACCOUNT TO HIS PERSONAL E-MAIL ACCOUNT**

51.     On September 8, 2020, and as evidence of his intent to leave Sunbelt, Defendant forwarded from his work e-mail account to his personal e-mail account an updated resume containing his new home address, as well as the details of his role with Sunbelt.  *See* Exhibit C.

52.     On September 23, 2020, Defendant forwarded from his work e-mail account to his personal e-mail account four documents titled as follows: (1) Copy of PBF Bid 2019_03_Last Change Revision – WH; (2) PBF Refinery Contacts; (3) Copy of Copy of [sic] Strategic National Accounts Directory; and (4) API Group Responsibility.

53.     The documents Defendant pilfered contained, respectively, detailed financial information for Sunbelt-client PBF Energy, detailed customer lists that included the contact information of PBF Energy employees in multiple U.S. states, contact information of Sunbelt employees who are Strategic Customer Representatives, as well as a breakdown of which departments and territories each Strategic Customer Representative was responsible for overseeing, and a detailed list of company names, account numbers, and project information related to Sunbelt-client APi Group across multiple U.S. states.

54.     On September 24, 2020, Defendant again forwarded two batches of documents from his work e-mail account to his personal e-mail account.

55.     The first batch contained documents titled as follows:  (1) Kiewit, Power Projects 7-22-19; (2) Kiewit Asset List (version 1); (3) Kiewit Asset List(AutoRecovered); (4) Kiewit Asset List; (5) Kiewit Power – Service Agreement 2-20-19[1836]; and (6) Kiewit Power – Three Year Service Proposal.

56.     The attached documents include information regarding Sunbelt's projects with Kiewit in multiple U.S. states, such as project names, locations, assigned equipment managers, start dates, and miscellaneous notes regarding updates and progress of each project; pricing information regarding equipment, labor costs, and total projected costs after one and five years; and a proposed service agreement between Sunbelt and Kiewit, which includes business development information, such  as business terms and conditions, pricing, and the names of the included projects.

57.     The second e-mail Defendant sent to his personal e-mail account on September 24, 2020, contained approximately thirty-six (36) attachments related to Sunbelt-client AMECO.

58.     Included in those documents were highly-detailed and meticulous financial breakdowns for Sunbelt's business with AMECO, including Sunbelt's national prices related to its business with AMECO, as well as contractual agreements between Sunbelt and AMECO, some of which predated Defendant's employment with Sunbelt.

59.     Further, on September 28, 2020, Defendant sent a document titled "Kiewit – Power Projects 7-22-19" to Scott Love of Platinum Specialty Services.

60.     This document contained extensive information regarding Sunbelt's projects with Kiewit in multiple U.S. states, such as project names, locations, assigned equipment managers, start dates, and miscellaneous notes regarding the status of each project.

61.     Upon information and belief, Platinum Specialty Services is "the union division of BRACE Industrial Group providing scaffolding, insulation, painting & coatings, concrete repair, heat tracing, and refractory in the Industrial Services Sector.   PLATINUM also provides commercial scaffolding services throughout the United States."   *See* OUR COMPANIES, http://www.brace.com/about-brace/our-companies/ (last visited Nov. 20, 2020).

62.     The documents Defendant forwarded from his work e-mail account to his personal e-mail account contained highly confidential information related to Sunbelt's clients and customers, pricing, and business development that has permitted Sunbelt to become a leading company in this highly-competitive and extremely-specialized business.   These documents pertained to customers that did business with Sunbelt in connection with PCs across the United States.

63.     Further, the documents include confidential customer information regarding the very same customers that Defendant sold to Sunbelt and for which, upon information and belief, he personally received approximately four million dollars.

### DEFENDANT JOINS A COMPETITOR

64.     On October 2, 2020—approximately one week after forwarding the above-described confidential documents to his personal e-mail account—Defendant resigned from Sunbelt.

65.     Upon information and belief, and despite the restrictive covenants contained in his Agreement, Defendant joined Sunbelt's direct competitor, EquipmentShare, as a National Sales Manager within approximately one week of his resignation.

### EQUIPMENTSHARE'S HISTORY

66.     Sunbelt and EquipmentShare are direct competitors.

67.     Upon information and belief, EquipmentShare is a corporation organized under the laws of Delaware with its principal place of business located at 5710 Bull Run Drive, Columbia, Missouri 65201.

68.     Similar to Sunbelt, EquipmentShare is engaged in the highly competitive and specialized business of renting and selling equipment and tools for use in the construction industry.

69.     Upon information and belief, EquipmentShare was founded in 2014 with the hope that it would become the "Airbnb of construction" as a result of its "EquipmentShare Track telematics system," which is used to track construction fleets and to gather information about the location and status of the equipment.

70.     Because this model quickly proved unworkable, EquipmentShare, upon information and belief, began opening more regional brick-and-mortal equipment rental operations in or around 2016.

71.     As of the filing of this Complaint, EquipmentShare purports to operate in Maryland, Virginia, South Carolina, Georgia, Florida, Alabama, Tennessee, Louisiana, Kentucky, Wisconsin, Louisiana, Arkansas, Missouri, Texas, Oklahoma, Kansas, New Mexico, Colorado, Arizona, Utah, Nevada, California, Oregon, and Washington.  *See* EQUIPMENTSHARE LOCATIONS, https://www.equipmentshare.com/locations (last visited Nov. 17, 2020).  Maps showing both Sunbelt and EquipmentShare's current locations are attached herein as Exhibit "F."

72.     Furthermore, according to the company's LinkedIn page, EquipmentShare is expanding to other states, such as Ohio and North Carolina.  A true and accurate copy of EquipmentShare's LinkedIn job postings is attached as Exhibit "D."

73.     EquipmentShare is currently in the process of expanding into the Northeastern United States, including the Philadelphia area, through its Baltimore, Maryland branch location.

13

74.     A recent job posting on ZipRecruiter described the Baltimore location as EquipmentShare's "Northeast region office," and an EquipmentShare blog indicated that the Baltimore branch serves customers with jobs in Philadelphia.  True and accurate copies of this EquipmentShare blog and ZipRecruiter post are attached as Exhibit "G."

75.     As the above information demonstrates, EquipmentShare is rapidly growing, and it seeks to penetrate a highly-competitive business and establish itself within the market share, particularly at the national level.

76.     In order to do so, it has been alleged in several court filings that EquipmentShare is targeting established equipment rental companies, such as Sunbelt, and poaching its employees, like Defendant, who possess years, and sometimes decades, of experience in the marketplace.  *See, e.g.*, Compl., *Sunbelt Rentals, Inc. v. Taylor*, No. SU-cv-2020000265 (Ga. Super. Feb. 17, 2020); Compl., *Sunbelt Rentals, Inc. v. Wendt*, No. 20-A-0342305 (Ga. Super. May 13, 2020); Compl., *Ahern Rentals, Inc. v. EquipmentShare.com, Inc.*, No. 2:20-cv-00333 (E.D. Tx. Oct. 15, 2020); Compl., *Ahern Rentals, Inc. v. EquipmentShare.com, Inc.*, No. 4:20-cv-01565 (E.D. Mo. Nov. 2, 2020).

77.     In particular, since February 2020 and May 2020, Sunbelt has been in active litigation with Taylor and Wendt, respectively, based on their violations of their employment agreements with Sunbelt on behalf of EquipmentShare.

78.     Upon information and belief, in the last year alone, EquipmentShare has hired at least four (4) employees who were formerly employed by Sunbelt:  (1) Cole Taylor; (2) Michael Wendt; (3) Grant Reviere; and (4) Robert Gessner.

79.     Additionally, Sunbelt's counsel has recently sent letters to Gessner and EquipmentShare's counsel regarding Gessner's contractual obligations, which are substantially similar to Defendant's obligations.

80.     Accordingly, upon information and belief, EquipmentShare knew upon hiring Defendant that Defendant was subject to substantially the same contractual restrictions as at least Gessner.

81.     Further, upon information and belief, EquipmentShare hired Defendant with the intent of competing with Sunbelt in New Jersey and to steal the customer relationships Sunbelt purchased from Defendant and sought to protect through valid and binding restrictive covenants.

82.     Sunbelt is not the first company that EquipmentShare has targeted in this way.

83.     In October and November 2020, Ahern Rentals, Inc. ("Ahern"), filed lawsuits against EquipmentShare, alleging, *inter alia*, patent infringement and violations of the Defend Trade Secrets Act.  *See generally* Compl., *Ahern Rentals, Inc.*, No. 2:20-cv-00333 (E.D. Tx. Oct. 15, 2020); Compl., *Ahern Rentals, Inc.*, No. 4:20-cv-01565 (E.D. Mo. Nov. 2, 2020).

84.     Specifically, Ahern alleged that, after EquipmentShare faced investor pressure to rapidly expand, it "engaged in a concerted plan to build brick-and-mortar locations through targeting Ahern and its employees, who possess decades of experience in the marketplace." Compl. ¶ 21, *Ahern Rentals, Inc.*, No. 2:20-cv-00333 (E.D. Tx. Oct. 15, 2020).

85.     Ahern further stated that "EquipmentShare's tortious plan included making misleading and defamatory statements about Ahern, poaching Ahern employees, and misappropriating Ahern's valuable trade secrets [in order to permit] EquipmentShare to grow from zero physical locations to approximately 50 locations in only a few years." *Id.*

**DEFENDANT EXPRESSES HIS INTENT TO COMPETE WITH SUNBELT AT THE
NATIONAL LEVEL ON BEHALF OF EQUIPMENTSHARE**

86.     Defendant's role as a National Sales Manager with EquipmentShare requires him to conduct similar duties to those he was completing during his employment with Sunbelt.

87.     Defendant's role with EquipmentShare requires Defendant to interact with customers and clients nationwide, as opposed to in a fixed region, just as he was required to do during his tenure with Sunbelt.

88.     Defendant candidly admitted, in a text message to his former supervisor Russ Brown, that he joined EquipmentShare to ". . . compete against your [Sunbelt's] National Team." A true and correct copy of this text message is attached as Exhibit "E."

89.     Defendant's text message is a clear admission that he is directly competing against Sunbelt in violation of his Agreement, and Sunbelt thus seeks appropriate relief.

90.     Furthermore, because of the nature of the trade secrets Defendant possesses, the position he holds with EquipmentShare, the potential competitive value of Sunbelt's trade secrets to EquipmentShare's ability to penetrate a highly-competitive market, it is inevitable that Defendant will  use, disclose, and otherwise misappropriate Sunbelt's trade secrets related to the renting and selling of tools and equipment for use in construction projects, in violation of his contractual confidentiality obligations and his obligations under law.

91.     Sunbelt's trade secrets include price lists with established national pricing, promotions, and other arrangements with specific customers.  Sunbelt's other sales-related trade secrets include customer lists, customer  contact information, customer preferences and inquiries, sales figures, sales strategy, and the whole spectrum of confidential, internal sales information.

92.     Defendant had access to these trade secrets in his role as Sales Development Director, where he oversaw national sales and coordinated with customers to realize those sales.

16

93.     If Defendant discloses these trade secrets to EquipmentShare, which, as previously mentioned, is attempting to penetrate a highly-competitive business, EquipmentShare will have the ability to undercut Sunbelt's pricing strategy or take other actions to unfairly put Sunbelt at a commercial disadvantage.

## COUNT I
## BREACH OF CONTRACT

94.     Sunbelt incorporates by reference the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

95.     The Employment Agreement is a valid and enforceable agreement between Sunbelt and Defendant, as it was supported by sufficient consideration, including, but not limited to, the mutual promises of Defendant and Sunbelt.

96.     In order to protect Sunbelt's legitimate interests, Defendant agreed in the Employment Agreement to certain non-competition, non-solicitation, and confidentiality provisions.

97.     These covenants were reasonably necessary to protect Sunbelt's legitimate business interests, namely, its trade secrets, confidential information, and customer relationships, which Defendant had access to in his role as a Sales Development Director for Sunbelt.

98.     The covenants will not cause undue hardship to Defendant, as they are limited in duration, geographic reach, and scope.

99.     Finally, the covenants will not impair the public interest, as the public has an interest in safeguarding fair commercial practices.

100.    Sunbelt performed all of its obligations under the Agreement and is entitled to the benefit of its bargain.

OMC\4815-5413-8836.v2-12/8/20

101.    Defendant has breached and continues to breach the Agreement by, among other things: (1) competing against Sunbelt by working for EquipmentShare in a national role, which, upon information and belief, requires him to conduct duties either identical or similar to those he completed during his employment with Sunbelt; (2) retaining Sunbelt's confidential information; and (3) using, disclosing, misappropriating, or threatening to use, disclose, and misappropriate, Sunbelt's confidential, propriety, and trade secret information to EquipmentShare.

102.    Defendant's breach and continued breach is evidenced by the fact that Defendant forwarded not only his updated resume but also Sunbelt's confidential information from his work e-mail account to his personal e-mail account.

103.    Defendant's breach and continued breach is established by the text message Defendant sent indicating that he intends to compete with Sunbelt at the national level.

104.    Defendant's conduct has been, and is, willful, malicious, wanton, and intended to damage Sunbelt's business.

105.    As a result of Defendant's conduct, Sunbelt has suffered, and continues to suffer, irreparable harm.

106.    As a result of Defendant's conduct, Sunbelt has suffered, and continues to suffer, damages in an amount to be determined at trial.

## COUNT II
## VIOLATION OF THE DEFEND TRADE SECRETS ACT,
## 18  U.S.C. § 1836 *et seq.*

107.    Sunbelt incorporates by reference the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

108.    The Sunbelt documents Defendant forwarded from his work e-mail account to his personal e-mail account, which contained customer lists, client-related and general pricing

18

information, and business development strategies, constitute trade secrets as defined by the Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq.*, as the information has independent economic value, actual or potential, because it is not generally known to and not readily ascertainable by proper means by another person who can obtain economic value from its disclosure or use.

109.    Sunbelt's trade secrets are used in interstate commerce and relate to products and services that are intended for use in interstate commerce.

110.    Sunbelt has taken reasonable steps to maintain the secrecy of its trade secrets by, among other things, requiring confidentiality agreements to be signed by any party granted access to Sunbelt's trade secrets.

111.    Sunbelt derives significant commercial and competitive value from its trade secrets and would be harmed by the use or disclosure of its trade secrets outside of Sunbelt's business, as the trade secrets have conferred a competitive advantage on Sunbelt over others in the relevant market.  Only through Defendant's improper disclosure of these trade secrets will they become known to other competitors.

112.    While Defendant was employed by Sunbelt, Sunbelt provided Defendant access to its trade secrets in confidence, subject to confidentiality agreements and restrictions.

113.    Defendant has misappropriated or will misappropriate Sunbelt's trade secrets by retaining them after the end of his employment with Sunbelt, using them for his own and/or EquipmentShare's purposes, and disclosing them to EquipmentShare.

114.    By virtue of the confidentiality provision in his Agreement, Defendant knew, or knows, that he may not misappropriate, disclose, or use Sunbelt's trade secrets for his or anyone's purposes other than Sunbelt's.

115.    Defendant's conduct has been, and is, willful, malicious, wanton, and intended to damage Sunbelt's business.

116.    As a result of Defendant's conduct, Sunbelt has suffered, and continues to suffer, irreparable harm.

117.    As a result of Defendant's conduct, Sunbelt has suffered, and continues to suffer, damages in an amount to be determined at trial.

## COUNT III
## VIOLATION OF THE NEW JERSEY TRADE SECRETS ACT,
### N.J. STAT. ANN. § 56:15-1 *et seq.*

118.    Sunbelt incorporates by reference the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

119.    The information Defendant obtained constituted a formula, pattern, business data compilation, program, method, technique, design, plan, procedure, or process that has actual or potential economic value as a result of not being known to others who might derive economic value as a result of not being known to others who might derive economic value from its use.

120.    The information includes Sunbelt's confidential and proprietary information regarding customer lists and contact information, project information, pricing details, and other trade secrets.

121.    Sunbelt has taken reasonable steps to maintain the secrecy of its trade secrets by, among other things, requiring confidentiality agreements to be signed by any party granted access to Sunbelt's trade secrets.

122.    Sunbelt derives significant commercial and competitive value from its trade secrets and would be harmed by the use or disclosure of its trade secrets outside of Sunbelt's business, as the trade secrets have conferred a competitive advantage on Sunbelt over others in the relevant

20

market.  Only through Defendant's improper disclosure of these trade secrets will they become known to other competitors.

123.     While Defendant was employed by Sunbelt, Sunbelt provided Defendant access to its trade secrets in confidence, subject to confidentiality agreements and restrictions.

124.     Defendant has misappropriated or will misappropriate Sunbelt's trade secrets by retaining them after the end of his employment with Sunbelt, using them for his own and/or EquipmentShare's purposes, and disclosing them to EquipmentShare.

125.     Specifically, given Defendant's position with EquipmentShare, which, upon information and belief, is virtually identical or substantially similar to that which Defendant held while employed by Sunbelt, Defendant has placed himself in a position that would lead to his inevitable disclosure of such information.

126.     By virtue of the confidentiality provision in his Agreement, Defendant knew, or knows, that he may not misappropriate, disclose, or use Sunbelt's trade secrets for his or anyone's purposes other than Sunbelt's.

127.     Defendant's conduct has been, and is, willful, malicious, wanton, and intended to damage Sunbelt's business.

128.     As a result of Defendant's conduct, Sunbelt has suffered, and continues to suffer, irreparable harm.

129.     As a result of Defendant's conduct, Sunbelt has suffered, and continues to suffer, damages in an amount to be determined at trial.

**COUNT IV**
**UNJUST ENRICHMENT**

130.     Sunbelt incorporates by reference the allegations contained in each of the foregoing paragraphs as if fully set forth herein.

21

131.    In the event this Court deems the Employment Agreement invalid, Defendant has been unjustly enriched and benefitted as a result of his wrongful taking of Sunbelt's confidential information.

132.    While employed by Sunbelt, and at Sunbelt's expense, Defendant received the benefit of learning Sunbelt's business development strategies, its approach to customer care, and its pricing information.

133.    In his new position, Defendant has an advantage against Sunbelt at Sunbelt's expense.

134.    Specifically, Defendant has confidential information that has typically permitted Sunbelt to gain an advantage over its competitors in a highly specialized and competitive market.

135.    Defendant is being compensated by EquipmentShare for the knowledge Defendant gained under Sunbelt's employ and, in particular, upon information and belief, Defendant receives commissions and other income for each customer he refers to EquipmentShare.

136.    Accordingly, Defendant's compensation from EquipmentShare, which stems from the unlawful and improper conduct alleged herein, has unjustly enriched Defendant to the detriment and harm of Sunbelt.

137.    Accordingly, as a matter of equity, Defendant should be required to disgorge any and all revenues, profits, and income resulting from the improper and unlawful conduct alleged herein and to reimburse Sunbelt in an amount equal to Defendant's unjust enrichment.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Sunbelt prays for and respectfully requests judgment in Sunbelt's favor and against Defendant:

A.      Granting temporary, preliminary, and permanent injunctions enjoining and restraining Defendant from:

          i.  Working for or being involved with the business of EquipmentShare for a period of one year beginning on the date Defendant ceases working for or being involved  with the business of EquipmentShare;

         ii.  Working in any role or capacity that is a subterfuge for otherwise prohibited work or involvement with EquipmentShare;

       iii.  Disclosing, using, or otherwise misappropriating Sunbelt's trade secrets;

       iv.  Violating any obligation to Sunbelt under the Employment Agreement or applicable state or federal law;

B.      Granting temporary, preliminary, and permanent injunctions requiring Defendant to  conduct a thorough, good faith search for Sunbelt's property and documents that may be in Defendant's possession, custody, or control, including any confidential, proprietary, or trade secret information, and to return all such materials to Sunbelt;

C.      Ordering that Defendant provide Sunbelt with written assurances that he has destroyed or returned all of Sunbelt's confidential information that he had in his position or that he forwarded from his Sunbelt e-mail account to his personal e-mail account;

D.      Awarding Sunbelt its attorneys' fees, costs, and other expenses incurred in enforcing its rights under the Employment Agreement;

E.      Awarding Sunbelt compensatory, special, consequential, exemplary, and punitive damages in an amount to be determined;

F.      Awarding Sunbelt interest; and

G.      Such other and further relief as the Court deems just and proper.


Respectfully submitted,

Dated:  December 9, 2020          **Obermayer Rebmann Maxwell & Hippel LLC**

*/s/ Matthew Green*

By:    Matthew Green, Esq. (03228-2003)
       Ivo Becica, Esq. (01240-2007)
       1120 Route 73, Suite 420
       Mount Laurel, New Jersey 08054
       (856) 857-1413
       matthew.green@obermayer.com
       ivo.becica@obermayer.com
       *Attorneys for Plaintiff, Sunbelt Rentals, Inc.*

24

## <u>CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2</u>

I, Matthew Green, Esquire, declare under penalty of perjury that the matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

Executed on:  December 9, 2020                    */s/ Matthew Green*
                                                                                     Matthew Green, Esq.

OMC\4815-5413-8836.v2-12/8/20

## **VERIFICATION**

I, Russ Brown, verify that I am an Executive Vice President at Sunbelt Rentals, Inc., Plaintiff in this proceeding, and that, based on my personal knowledge and my review of Sunbelt documents and information, the facts set forth in the attached Second Amended Verified Complaint are true and correct to the best of my knowledge, information, and belief, except (1) where expressly stated to be based upon information and belief, in which case, I believe them to be true, and (2) legal conclusions, for which I expressly defer to Plaintiff's counsel. I understand that false statements herein are subject to the penalties of 20 U.S.C. § 1746 relating to sworn declarations to authorities.

Russ Brown
Executive Vice President
Sunbelt Rentals, Inc.

Dated:  December ___, 2020

25