**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

|  |  |
|---|---|
| SUNBELT RENTALS, INC., | |
| Plaintiff, | |
| v. | Civil No. 20-17611 (RMB/AMD) |
| MICHAEL LOVE, | **OPINION** |
| Defendant. | |

**RENÉE MARIE BUMB, United States District Judge**

This matter comes before the Court upon a preliminary injunction, pursuant to Rule 65(a) of the Federal Rules of Civil Procedure, brought by Plaintiff Sunbelt Rentals, Inc. ("Sunbelt"). [Docket No. 3-1.] Sunbelt is a national rental equipment company that employed Defendant Michael Love from approximately August 2018 until October 2020 when Defendant Michael Love abruptly left to work for a competitor company. As part of their employment agreement, Sunbelt and Love agreed to two standard non-compete clauses (the "Non-Compete Clauses" or "Clauses"). Sunbelt argues that Love's new employment violates the Non-Compete Clauses and alleges a breach of contract claim. Moreover, Sunbelt alleges that days before Love resigned, he misappropriated highly confidential business documents of Sunbelt and forwarded them to not only himself but his brother in violation

of the Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq. (the "DTSA"), and the New Jersey Trade Secrets Act, N.J. STAT. ANN. § 56:15-1 et seq. (the "NJTSA"). Love admits to having taken such documents and has apologized for his misconduct. In order to prevent further irreparable harm, Sunbelt seeks to enjoin Love from continuing his new employment on two grounds: the Non-Compete Clauses and the DTSA/NJTSA. Because this Court finds that Sunbelt has demonstrated that it will likely succeed in establishing that Love breached his employment contract and violated the DTSA and NJTSA, and because the Court finds that Sunbelt will likely suffer irreparable injury absent a preliminary injunction, as set forth below, the Court will grant Sunbelt's application for a preliminary injunction.

## I.    FINDINGS OF FACT

The Court conducted hearings in this case on December 16 and 17, 2020. [See Docket Nos. 27, 29.] The following constitutes the Court's findings of fact pursuant to Rule 52 of the Federal Rules of Civil Procedure.

## A.    Sunbelt Rentals, Inc.'s General Structure[1]

1.    Plaintiff Sunbelt Rentals, Inc. ("Sunbelt") is a nationwide rental equipment company with approximately 930 locations in 46 states. [Docket No. 27, at 38:22-39:9.]

2.    Sunbelt's physical store locations, which is where Sunbelt's revenue is generated and where customers are directly serviced, are called "Profit Centers" ("PCs"). [Id. at 39:12-40:3.]

3.    Sunbelt also has "Cost Centers" ("CCs"), which are a multi-area or multi-regional centers that house people and other corporate costs that are serving a broader area. [Id. at 40:4-8.] CCs, unlike PCs, serve a broader area that encompasses smaller markets. [Id.]

4.    Each PC and CC has its own four-digit code for internal use, including codes to identify where employees and customer accounts are assigned. [See id. at 40:14-16; 47:5-7.]

5.    Each PC and CC is subsumed into one of two territories: east and west. [See id. at 41:12-15.]

---

[1] This subsection is predominantly adopted from Sunbelt's Proposed Findings of Fact and Conclusions of Law which are not genuinely disputed by Defendant. [See Docket No. 33, ¶¶ 1-14.]

6.    PC 1092 is Sunbelt's Paulsboro, New Jersey location. It is part of CC 0873, which is part of the Eastern Territory. [See id. at 47:2-3, 63:4-64:2.]

7.    Fred Ransom, who testified at the hearing, was Sunbelt's Vice President of Special Projects as of August 2018. [Id. at 10:20-11:8.]

8.    Russ Brown, who testified at the hearing, is Sunbelt's Executive Vice President of the Eastern Territory, which includes CC 0873's approximately 450 PCs that span from "Bangor, Maine, . . . across Philadelphia, over to . . . Indianapolis down to Cleveland, as far south as Arkansas and then all the way down the U.S." [Id. at 38:8-9, 40:21-41:5.]

**B.    Sunbelt Acquires Interstate Aerials, Hires Love**

9.    Until approximately August 2018, Defendant Michael Love was employed as the Vice President of Sales for Interstate Aerials, LLC ("Interstate"), a regional rental equipment company. [See id. at 16:5-9, 42:11-13.]

10.    Love worked at Interstate's Paulsboro, New Jersey location, which was both a store and a corporate office. [See id. at 16:7-9; Docket No. 29, at 60:3-12.]

4

11.  As part of his contract with Interstate, Love received an annual salary of $300,000 and an annual bonus of $50,000. [Docket No. 27, at 16:10-15.]

12.  In the event that Interstate was sold to a third party, Love would be entitled to "2.5% of the sales price, net of any and all costs, tax liabilities, and the like." [Docket No. 16-1, Exhibit B.][2]

13.  In August 2018, Interstate was sold to Sunbelt for approximately $200,000,000. [See Docket No. 27, at 11:4-5, 12:8-11, 43:21-25; see also Docket No. 20, at 3.]

14.  Love received approximately $4,000,000 from the sale. [Docket No. 27, at 44:1-5.]

15.  Around the time of the Interstate acquisition, Sunbelt entered into negotiations with Love in an effort to hire him. [See, e.g., Docket No. 27, at 16:10-12.]

---

[2] Some of the exhibits that were utilized and entered into evidence during the hearings on December 16 and 17, 2020, also appear as exhibits or attachments in filings on the Docket. For ease of reference, the Court will cite to the Docket version of those exhibits. Any exhibits that do not appear on the Docket will be cited as they were identified upon being entered into evidence at the hearings. (For example, "Hearing Exhibit P-M.")

16.  Brown was involved with the negotiations. [See id. at 105:16-24.]

### 1.   The Original Offer Letter and Agreement

17.  Sunbelt made its first employment offer to Love on August 2, 2018, by presenting Love with an offer letter (the "Original Offer Letter") and a standard employment agreement (the "Original Agreement"). [See Docket No. 20-1, Exhibits 1-A, 1-B.]

18.  The Original Offer Letter listed the position of Sales Development Director at PC 1092 in Paulsboro, New Jersey. [Id. at Exhibit 1-A.]

19.  The Original Offer Letter outlined Love's salary and other terms of employment and stated that his signature would indicate his acceptance of the employment offer. [Id.]

20.  The Original Offer Letter had a signature line at the bottom for Love to sign and date, above which the words "Agreed and Accepted" appeared. [Id.]

21.  Neither Love nor a Sunbelt representative ever signed the Original Offer Letter. [See id.; Docket No. 29, at 129:21-22.]

22.  The Original Agreement contained, among other provisions, confidentiality, non-competition, and non-solicitation clauses, which is typical for Sunbelt's employees who will have access to sensitive information that could provide a competitor with an unfair advantage. [See Docket No. 20-1, Exhibit 1-A; Docket No. 27, at 44:11-16.]

23.  The Original Agreement included a line for Love to mark his initials at the bottom right-hand corner of each of its twelve pages. [Docket No. 20-1, Exhibit 1-B.]

24.  The initial line of the Original Agreement was prefaced by the following text: "Initial by Michael Love (PC # 1092)." [Id.]

25.  The Original Agreement's Non-Compete Clauses would have precluded Love, for a period of one year after the date of his termination from employment with Sunbelt, from working for a Sunbelt competitor within a defined "Territory," among other things. [Id., Exhibit 1-B, ¶ 5.2.2.]

26.  The Original Agreement's Non-Compete Clauses defined "Territory" as

> the geographical area within a fifty (50) mile radius of any of [Sunbelt's] stores in which, or in connection with which, Employee performed or was responsible for

7

performing services at any time during the twelve (12) month period immediately preceding the termination or expiration of this Agreement for any reason (the "Designated Stores").

[Id., Exhibit 1-B, at 5.]

### 2.    Love Hires Counsel

27.  After receiving the Original Offer Letter and Agreement, Love hired attorney Frank A. Piarulli to assist him in negotiating the terms of his employment. [Docket No. 29, at 82:14-18.]

28.  Piarulli was admitted to practice law in New Jersey in December 1988 and is an active New Jersey attorney in good standing.  [See  Attorney  Search  Results,  N.J.  Courts, https://portalattysearch-cloud.njcourts.gov/prweb/PRServletPubli cAuth/-amRUHgepTwWWiiBQpI9_yQNuum4oN16*/!STANDARD?AppName=Attorn eySearch (last visited Jan. 8, 2021).] Piarulli did not testify at the hearing.

29.  During these negotiations, Love and his attorney were paying attention to the definition of "Territory" in the Non-Compete Clauses. [Docket No. 29, at 126:22-127:2 ("Q: So [the definition of territory] was something that you, along with your attorney at the time, was — were paying attention to, correct? A: Yes.").]

### 3. The Final Offer Letter and Agreement

30. On August 16, 2018, Sunbelt presented Love with another offer letter (the "Final Offer Letter") and employment agreement (the "Final Agreement"). [See Docket No. 20-1, Exhibits 3-A, 3-B.]

#### i. The Final Offer Letter

31. The Final Offer Letter was "for the position of Sales Development Director at PC 1092 in Paulsboro, NJ." [Compare id., Exhibit 1-A, with id., Exhibit 3-A.]

32. However, unlike the Original Offer Letter, the Final Offer Letter was signed by a Sunbelt representative (Brown) and did not have a signature line for Love to sign and date, nor any language indicating that Love had "agreed and accepted" the offer. [Compare id., Exhibit 1-A, with id., Exhibit 3-A.]

33. The Final Offer Letter did not provide that its provisions were legally binding on either party. [See id., Exhibit 3-A.]

#### ii. Job Duties and Term (Paragraphs 2 and 4)

34. The Final Agreement states that Love "shall perform such duties as may be reasonably required by the Board of Directors ('Board'), the Chief Executive Officer or their designee from time

to time." [Compare id., Exhibit 1-B, ¶ 2, with id., Exhibit 3-B, ¶ 2.]

35.  The Final Agreement provides that

it shall be automatically extended for successive one year periods unless either party notifies the other that it does not intend for the term to be extended, which notice shall be given . . . at least ninety days prior to the expiration of the then-current term of this Agreement.

[Compare id., Exhibit 1-B, ¶ 4.1, with id., Exhibit 3-B, ¶ 4.1.]

36.  Unlike the Original Agreement, the Final Agreement provides that the initial term of the Agreement is two years, not one. [Compare id., Exhibit 1-B, ¶ 4.1, with id., Exhibit 3-B, ¶ 4.1.]

### iii. Non-Competition Clauses (Paragraphs 5.2.4 and 5.2.5) and Pertinent Definitions

37.  The two non-competition clauses (Paragraphs 5.2.4 and 5.2.5) contained in the Original and Final Agreements were identical. [Compare id., Exhibit 1-B, ¶¶ 5.2.4, 5.2.5, with id., Exhibit 3-B, ¶¶ 5.2.4, 5.2.5.]

38.  The two Non-Compete Clauses contained in the Final Agreement provide that, during the Agreement term and for one year after the

Agreement expired or was terminated for any reason (the "Restrictive Period"), Love

    shall not directly or indirectly:

    . . . .

       5.2.4    compete with the Corporation, its successors and assigns by engaging, directly or indirectly, in the Business as conducted at the Designated Stores or in a business substantially similar to the Business as conducted at the Designated Stores, **within the "Territory,"** as hereinafter defined; or

       5.2.5    provide information to, solicit or sell for, organize or own any interest in . . . , **or become employed or engaged by, or act as agent for** any person, corporation, or other entity that is directly or indirectly engaged in business **in the "Territory"** . . . , which is substantially similar to the Business as conducted at the Designated Stores or competitive with Corporation's Business as conducted at the Designated Stores; provided, however, that nothing herein shall preclude the Employee from (i) engaging in activities or being employed in a capacity that do not actually or potentially compete with Corporation's Business or (ii) holding not more than one percent (1%) of the outstanding shares of any publicly held company which may be so engaged in a trade or business identical or similar to the Business of the Corporation.[3]

[Compare id., Exhibit 1-B, ¶¶ 5.2.4, 5.2.5, with id., Exhibit 3-B, ¶¶ 5.2.4, 5.2.5 (emphases added).]

39. The Final Agreement modified the definition of "Territory" to replace the phrase "performed or was responsible for performing

---

[3] "Corporation" is defined as Sunbelt Rentals, Inc., in the Agreement.

services" with the phrase "was assigned," such that the final language reads as follows:

> As used herein, the "Territory" means: the geographical area within a fifty (50) mile radius of any of the Corporation's stores in which, or in connection with which, Employee was assigned to at any time during the twelve (12) month period immediately preceding the termination or expiration of this Agreement for any reason (the "Designated Stores").

[Id., Exhibit 3-B, at 5; compare id., Exhibit 1-B, at 5, with id., Exhibit 3-B, at 5.]

40. The Final Agreement does not specifically define the terms "stores," "assigned to," or "in connection with." [See id., Exhibit 3-B.]

41. The Final Agreement does not require Sunbelt to provide Love with either verbal or written notice of changes to his job duties or assignment. [See id.] Stated differently, the Final Agreement does not state that Love's role and duties were confined to PC 1092 only during the course of his employment.

42. The Final Agreement did not modify the Original Agreement's definition of "Business," which is:

> the business of (i) selling and renting equipment, tools, climate control units, scaffolding, oil & gas equipment (including, but not limited to, man lifts, generators, light towers, trash trailers, shock subs, test separators, shower trailers, trash pumps, 3" water

pumps, 6" water pumps, water transfer services, fuel trailers, air compressors, water stations, RV pack (light tower/water station combination), trailer houses, sewer systems, etc.) and parts for use in the manufacturing, industrial and construction industries, (ii) the sale of new and used OCTG[4] goods, frac valve repairs, 500BBL tanks, interior & exterior coatings, heater trailers, burner assemblies for heater treaters; (iii) selling and renting tools, climate control units and homeowner repair equipment to retail consumers, . . . (iv) the provision of related services, including, but not limited to, the erecting and dismantling of scaffolding, providing crane trucks, delivery of OCTG goods, delivery of frac valves, burner installation and repair, test separator repair, catering services and portable restroom services . . . [and (v)] any other lines of business in which the Corporation becomes engaged during the term of this Agreement.

[Compare id., Exhibit 1-B, ¶ 5, with id., Exhibit 3-B, ¶ 5.]

### iv.   Confidentiality and Non-Solicitation Clauses (Paragraphs 5.1, 5.2.1, and 5.2.2)

43.   The Final Agreement's confidentiality provisions and employee non-solicitation provisions are identical to those provided for in the Original Agreement. [Compare id., Exhibit 1-B, ¶¶ 5, 5.1, 5.2.1, with id., Exhibit 3-B, ¶¶ 5, 5.1, 5.2.1.]

44.   The Final Agreement's confidentiality provision provides as follows:

5.1   During the term of this Agreement and after its termination or expiration for any reason, Employee will not, without Corporation's prior written consent, use, divulge, disclose, furnish, or make accessible to

---

[4] This acronym is undefined in the Agreement.

> any third person, company, or other entity any aspect of
> Confidential Information, Intellectual Property, or
> Proprietary Materials for any purpose, including through
> an online social networking website, except on
> Corporation's behalf.

[Id., Exhibit 3-B, ¶ 5.1.]

45.  The Final Agreement defines "Confidential Information"
broadly, to include

> Existing and future equipment information, customer
> lists, identities of distributors and distributorships,
> sales methods and techniques, costs and costing methods,
> pricing techniques and strategies, sales agreements with
> customers, profits and product line profitability
> information, unpublished present and future marketing
> strategies and promotional programs, and other
> information regarded by Corporation as proprietary and
> confidential . . . .

[Id., Exhibit 3-B, ¶ 5; compare id., Exhibit 1-B, ¶ 5, with id.,
Exhibit 3-B, ¶ 5.]


46.  The Final Agreement's employee non-solicitation provision
prohibits Love from:

> solicit[ing] on behalf of a competing business the
> employment of, any person who at any time during the
> twelve (12) calendar months immediately preceding the
> termination or expiration of this Agreement was employed
> by Corporation.

[Id., Exhibit 3-B, ¶ 5.2.1.]


47.  The only provision in this section of the Final Agreement
that was modified was Paragraph 5.2.2 — the Agreement's customer

non-solicitation provision. [Compare id., Exhibit 1-B, ¶ 5.2.2, with id., Exhibit 3-B, ¶ 5.2.2.] Unlike the Original Agreement, the geographic restriction for the non-solicitation provision in the Final Agreement is limited in scope only to Love's Territory, and does not also include other locations where Love had "business contact" with those customers. [Compare id., Exhibit 1-B, ¶ 5.2.2, with id., Exhibit 3-B, ¶ 5.2.2.]

48.  Omitted from Paragraph 5.2.2 of the Final Agreement was the following language: "and to any office, store or other place of business in which, or in connection with which, Employee has had business contact with such persons or entities during the twelve (12) calendar months immediately preceding the termination or expiration of this Agreement for any reason." [Compare id., Exhibit 1-B, ¶ 5.2.2, with id., Exhibit 3-B, ¶ 5.2.2.]

49.  In all other respects, the Final Agreement's confidentiality and non-solicitation provisions were identical to the Original Agreement's. [Compare id., Exhibit 1-B, at 4-5, with id., Exhibit 3-B, at 3-5.]

### v.   Other Pertinent Provisions

50.  The Final Agreement contains a stipulation that Love's breach of the restrictive covenant would cause irreparable damages

to Sunbelt. [Compare id., Exhibit 1-B, ¶ 5.3.1, with id., Exhibit 3-B, ¶ 5.3.1.]

51. The Final Agreement contains a tolling provision that provides that the Restrictive Period would not "include any period of time in which [Love] is in violation of the Restrictive Covenants." [Compare id., Exhibit 1-B, ¶ 5.3.3, with id., Exhibit 3-B, ¶ 5.3.3.]

52. The Final Agreement includes an acknowledgement of reasonableness relative to the restrictive covenants. [Compare id., Exhibit 1-B, ¶ 10, with id., Exhibit 3-B, ¶ 10.]

53. The Final Agreement contains an integration clause stating that the Agreement is the entire agreement of the parties. [Compare id., Exhibit 1-B, ¶ 15, with id., Exhibit 3-B, ¶ 15.]

54. Unlike the Original Agreement, the Final Agreement provided that Love was entitled to receive "240 hours (6 weeks) of Paid Time Off (PTO) each year to be used in accordance with Corporation's policy in effect from time to time." [Compare id., Exhibit 1-B, ¶ 3.1.3, with id., Exhibit 3-B, ¶ 3.1.3.]

55.  Unlike the Original Agreement, the Final Agreement provided Love with the opportunity to terminate the contract with or without cause during its initial term, with notice to Sunbelt. [Compare id., Exhibit 1-B, ¶¶ 4.2-4.2.2, with id., Exhibit 3-B, ¶ 4.2.3.]

56.  The Final Agreement did not integrate Love's Final Offer Letter as a contractual provision. [Compare id., Exhibit 1-B, with id., Exhibit 3-B.]

57.  The Final Agreement integrates a "Schedule 1," which was paginated with the Employment Agreement and provided that Love's base salary would be $300,000 for the first two years of his employment. [Compare id., Exhibit 1-B, at 12, with id., Exhibit 3-B, at 10.]

58.  Unlike the Original Agreement, Schedule 1 of the Final Agreement included bonus provisions, providing that Love was entitled to a one-time bonus of $50,000 at the end of each of his first two years of employment, and a retention bonus in the amount of $250,000, less applicable taxes and deductions, at the end of two years (or earlier, upon specified conditions). [Compare id., Exhibit 1-B, at 12, with id., Exhibit 3-B, at 10.]

59.   The Final Agreement provided lines for Love to mark his initials at the bottom right-hand corner of each agreement page. [Compare id., Exhibit 1-B with id., Exhibit 3-B.]

60. However, unlike the Original Agreement, which included "Initial by Michael Love (PC # 1092)" next to Love's initial line on each page, the Final Agreement included only "Initial by Michael Love" next to Love's initial line on each page with no reference to the Paulsboro PC. [Compare id., Exhibit 1-B with id., Exhibit 3-B.]

61. The Final Agreement does not reference the Paulsboro, New Jersey PC (1092) either by name or by number. [See id., Exhibit 3-B.]

### 4.   Love's Decision to Sign the Final Agreement

62. Love certified that he was hesitant to sign the Original Agreement because he "wanted a more prominent national role Brown was proposing and the increased earning opportunities that would attend such a role." [See Docket No. 29, at 69:15-21.]

63. Love certified and testified: "Throughout my negotiations with Brown, I made clear that because Sunbelt was not placing me in a national role to start, I would not agree to any post-

employment restrictive covenant that restricted my ability to compete outside the Paulsboro market." [Docket No. 20-1, ¶ 9; Docket No. 29, at 70:21-71:22],

64. Love testified that he would not have agreed to a contract that restricted him nationally because "[i]t would have taken [his] livelihood away from [him] for 12 months." [Id. at 73:4-5.]

65. Conversely, Brown testified that "[s]trictly on the basis from a common sense standpoint, it would make no sense to agree to that kind of covenant when [Love's] sole purpose for coming on board was to grow and merge the national customers he was responsible for." [Docket No. 27, at 52:10-13.]

66. Brown testified that, given Love's job responsibilities, Brown would not have agreed to Love being restricted solely within the 50-mile radius around Paulsboro, New Jersey. [Id. at 53:16-21.]

67. The negotiations outlined above illustrate that, while Love was initially concerned that his role was going to be limited to the Paulsboro location, Sunbelt addressed those concerns to Love's satisfaction before he signed the Final Agreement as set forth below. [See Docket No. 27, at 58:18-59:1.]

68.  At the time that the parties agreed to the Final Agreement, it was clear to all parties that Love's role would be national in nature. [Docket No. 29, at 32:20-21.]

69.  There was no suggestion that Love's role would be limited to "working at a single location," such as the Paulsboro location. [See, e.g., id.; Docket No. 27, at 58:18-20.]

70.  The evidence presented supports Sunbelt's position that the reason Love agreed to sign the amended agreement was because Brown made clear, and Love understood, that his role would be a national role.

71.  Indeed, Love negotiated an annual salary of $300,000, an annual bonus of $50,000, and a retention bonus of $250,000 after two years, all of which are commensurate with an employee who held a national role. [See Docket No. 20-1, Exhibit 3-B, at 10; Docket No. 27, at 59:2-6, 138:13-14.]

72.  Brown's testimony that the company's records were maintained a certain way explains that other employees were not able to know of Love's high salary was credible and supported by documentary evidence. [Docket No. 27, at 58:20-59:6.]

73.  Love's testimony — that after having been with Sunbelt for years, part of his concern at the end of his employment was getting a national title which he considered to be distinct from a national role — supports the Court's conclusion that Love understood he had a national role from the beginning of his employment. [See, e.g., Docket No. 29, at 64:11-15.]

74.  Brown credibly testified: "I don't even remember the words [sic] 'title' being used until these proceedings. We always talked about a role. . . . You [referring to the lawyers] all brought in title, not me. [Love] had a national role always from day one." [Id. at 32:16-21.]

75.  The Court thus finds that during the negotiations and at the time Love signed the Final Agreement, Love had only expressed a desire to have a national role, but did not demand a national title.

76.  The parties and their respective counsel negotiated the contract and exchanged approximately seven different versions, until the parties reached an agreement as to the appropriate terms on August 17, 2018. [Id. at 71:4-6; Docket No. 16-1, Exhibit A, at 8.]

77.  Love signed the Final Agreement because the parties' negotiations provided assurances that Love was going to be in a national role, as he demanded, and that his role would not be limited to Paulsboro. [See Docket No. 27, 58:18-59:1.]

78.  Upon being hired, Love was initially internally assigned to PC 1092 in Paulsboro. [Id. at 13:15-24, 47:10-14.] This was done, however, merely "as a placeholder in [the] payroll system, so [Sunbelt] could pay" Love. [Id. at 13:18-20.]

79.  Additionally, Love's supervisor was initially listed as Taylor Romig, who was a Human Resources employee assigned to assist Sunbelt transition and onboard Love and other Interstate hires. [Id. at 57:23-58:11.]

80.  Romig does not have any particular connection to PC 1092, aside from onboarding employees there. [Id. at 58:9-11.]

81.  Indeed, the Final Agreement contemplates "[c]hanges in or additions to Employee's duties or title(s) under this Agreement." [See Docket No. 20-1, Exhibit 3-B, ¶ 2.]

82.  Love's testimony that he believed he was confined only to the Paulsboro store when he signed the Final Agreement is not credible. The following findings further demonstrate the Court's finding.

### C.   Love Had a National Role

83.  Love was hired to transition his Interstate customers over to Sunbelt. [See, e.g., Docket No. 27, at 138:20-23; Docket No. 29, at 64:13-15.]

84.  There is no dispute that this was a national role, given that the Interstate customers were located all over the country. [See, e.g., Docket No. 29, at 143:7-21.]

85.  On August 20, 2018, three days after the Final Agreement was signed, Sunbelt changed Love's internal assignment from PC 1092 to CC 0873 — the Eastern Territory Cost Center. [Docket No. 24-1, Exhibit C.] This change was reflected in Workday as of August 24, 2020. [Id.]

86.  Love remained assigned to CC 0873 for the rest of his time with Sunbelt, including the twelve months prior to his resignation. [Id.]

87.  At the same time, Sunbelt changed Love's supervisor from Romig to Brown. [Docket No. 27, at 58:16-17.]

88.  These changes were made to reflect the mutual agreement between the parties that Love would not work at a single location, but rather would serve a national role, which was better suited to CC 0873 and Brown's supervision. [Id. at 58:23-59.]

89.  These changes were made on Workday, Sunbelt's internal human resources system. [See id. at 55:19-23.]

90.  All Sunbelt employees can access their own Workday profiles, which is where they can update career interests and request paid time off. [Id. at 59:17-19; Docket No. 29, at 70:2-5.]

91.  Therefore, via his Workday profile, Love could access and view the changes made to his internal designation and supervisor. [See Docket No. 27, at 55:19-23.]

92.  Throughout his employment, Love did access and make changes to his Workday profile. [Docket No. 29, at 83:8-16.]

93.  Love did not, however, get any sort of affirmative notice (for example, an email or push notification) of this change.[5] [See id. at 55:24-56:25.]

94.  At no time during his employment with Sunbelt did Love report to Jeff Labinski, the then-Manager of PC 1092. [Id. at 64:5-9.]

95.  Love's salary was roughly three times greater than Labinski's. [Id. at 64:12.]

96.  At no time during his employment with Sunbelt did Love report to Joshua Johnson, the District Manager of the Delaware Valley District (which includes PC 1092). [See id. at 64:13-18, 65:11-14.]

97.  Love's salary was roughly two times greater than Johnson's. [Id. At 65:19.]

98.  At no time during his employment with Sunbelt did Love report to Joel Theros, the Vice President of Region Two (which includes PC 1092). [Id. at 65:21-23, 66:4-9.]

---

[5] As mentioned, such notice is not required under the Final Agreement. [See supra, ¶ 41.]

99. Love's salary was roughly 1.5 times greater than Theros's. [Id. at 66:17-18.]

100. On August 21, 2018 — four days after signing the Final Agreement — Love emailed Brown to ask for assistance in "best understand[ing] how [Love] can help grow the national platform." [Docket No. 24-1, Exhibit F; Docket No. 27, at 68:15-16.]

101. On September 20, 2018, Love emailed Brown to indicate that he was working with Rick Piper, Sunbelt's Vice President of National Accounts, to gain an "understanding of how the National Program functions as a Team and the pro's [sic] and con's [sic] of the process to get [things] done at the street level." [Hearing Exhibit P-S.]

102. In June 2019 — less than a year after starting with Sunbelt — Love requested permission from Brown to move to California. [Docket No. 27, at 82:13-15.] This request was granted, and Love moved to California on June 28th, 2019. [Docket No. 29, at 90:2-3.] As Love testified, Brown had no issue with Love moving to California "because [Love] could work remotely like every other national account manager." [Id. at 77:1-10, 151:20-152:2.]

103. Unlike Love, all of the approximately 50 Sunbelt employees specifically assigned to PC 1092 lived close enough to Paulsboro so that they could report to that location for their regular workdays. [Docket No. 27, at 83:2-6.]

**D.   Love's Access to Confidential Documents**

104. During his time at Sunbelt, Love successfully performed the duties that were assigned to him. [Id. at 49:5-8.]

105. Love's responsibilities expanded beyond simply transferring the Interstate customers to Sunbelt, as he continued to work with many of Sunbelt's national customers after the transition was complete. [See, e.g., Docket No. 20-1, Exhibits G, I.]

106. These national customers included: AMECO, Fluor Corporation, Fluor Government Group, Fluor Service, Monroe Energy, PBF Refining, PSEG Facilities, Betchel Corporation, Gemma Power Systems, SNC Lavalin American Inc., Nooter Corporation, Burns & McDonnell, Sentry Electric Group, IEA Renewable Energy, First Solar Inc., and Sargent & Lundy. [Id., Exhibit G; see also Docket No. 29, at 147:11-19, 150:20-151:6.]

107. In an email sent to Brown and others on May 11, 2020, Love described the tasks he had accomplished since his hiring, which

included: assisting in transferring Interstate's customer base; assisting Sunbelt's National Sales Team with customers that Love had strong relationships with (including Kiewit, APi Group, Ameco, Fluor, AECOM, Riggs, and Superior Construction); bringing "new opportunity in through RFQ/RFP's approvals"; assisting with Sunbelt's Industrial Resource Group on the West Coast while Sunbelt sought out a Regional Manager for the area; and continuing to work with a West Coast profit center and sales team. [Docket No. 24-1, Exhibit I.]

108. Sunbelt allowed Love's initial contract to automatically renew for one year when it expired on August 17, 2020. [See Docket No. 20-1, Exhibit 3-B, ¶ 4.1.]

109. As a result of Love's responsibilities, he had access to Sunbelt's highly sensitive customer information, business strategies, and pricing details. [Docket No. 27, at 83:7-15.]

110. Moreover, in his position Love was privy to knowledge of situations in which customers were dissatisfied with Sunbelt or Interstate Aerials' current operating procedures. [Id. at 84:1-4.]

111. On September 23, 2020, Love forwarded from his work email to his personal email four documents, containing highly sensitive materials of Sunbelt, entitled: (1) "Copy of PBF Bid 2019_03_Last Chance Revision — WH," which was a confidential document providing information regarding Sunbelt's pricing and the company's ability to perform for that customer relative to its competitors; (2) "PBF Refinery Contracts"; (3) "Copy of Copy of Strategic National Accounts Directory," which contained contact information for each of Sunbelt's national account directors and the customers — including some of Sunbelt's top sellers and customers — for which those individuals were responsible; and (4) "API Group Responsibility," which contains Sunbelt's offerings and requests between Sunbelt and the customer API Group. [See Docket No. 27, at 84:24-91:9.]

112. Sunbelt is justifiably concerned that the directory could be used by Love and/or his new employer EquipmentShare to gain an advantage because it provides a contact list of Sunbelt's top customers that a competitor such as EquipmentShare could use to grow its national account business, which Love has admitted he seeks to do. [See Docket No. 16-1, Exhibit E.]

113. The next day, September 24, 2020, Love forwarded two batches of documents from his work email to his personal email. [Hearing Exhibit P-M.]

114. The first batch contained documents relating to Sunbelt's projects with Kiewit, such as pricing information, restrictions, and the geographies in which the company is operating. [Id.; Docket No. 27, at 92:5-8.]

115. The second batch contained documents that were highly detailed and had financial breakdowns for Sunbelt's business with another client, AMECO. [Hearing Exhibit P-M; Docket No. 27, at 91:15-92:1.]

116. Four days before his resignation, on September 28, 2020, Love sent a document titled "Kiewit — Power Projects 7-22-29" to his brother, Scott Love, of Platinum Specialty Services, a customer of Sunbelt that provides scaffolding and insulation services throughout the United States. [Docket No. 29, at 102:3-7; Hearing Exhibit P-V.]

117. The document contained information regarding Sunbelt's projects with Kiewit, including project names, assigned equipment

managers, start dates, and notes regarding the status of each project. [Docket No. 29, at 106:9-15.]

118. Love admits to having sent this email — the body of which read, "Let me know you received this." — to his brother and has no reason to believe that his brother did not access the email and its attachments. [Id. at 109:9-16.]

119. One week later, on October 2, 2020, Love resigned from Sunbelt. [Id. at 31:4-5.]

120. Approximately one week after Love's resignations, Sunbelt learned that Love had begun working for EquipmentShare. [Docket No. 16, ¶ 65.]

121. EquipmentShare is a direct competitor of Sunbelt's because it is engaged in the business of selling and renting equipment and tools for use in construction, industrial arenas, and manufacturing. [Id., ¶ 65.]

122. EquipmentShare is a relatively new company to the equipment rental industry, and Love, by his own admission in a text message to Brown, joined EquipmentShare to "compete against [Sunbelt's] National Team." [Docket No. 16-1, Exhibit E.]

123. EquipmentShare competes with Sunbelt within a 50-mile radius of Sunbelt stores encompassed by CC 0873. [See Docket No. 16, ¶ 71; Docket No. 16-1, Exhibit F.]

124. Love admits that he took the aforementioned documents because he was angry at and frustrated with Sunbelt for not, by his estimation, providing him an adequate "opportunity to earn and make a living that [he] was used to."[6] [Docket No. 29, at 58:15-59:12.]

125. Love testified that the numerous emails he sent to himself and his brother were simply a regrettable mistake, the product of him allowing his "ego to get involved." [Id.]

126. Love also testified that he only sent the emails in question while he was "cleaning [his] laptop out to be transferred back to [Sunbelt] in a brief period of time" and that he simply "cleaned [his] entire desktop off, personal and" work documents. [Id. at 59:10-11, 99:17-100:1.]

---

[6] This despite the fact that Sunbelt paid Love the same salary that he had been receiving at Interstate and that, approximately a month prior to his resignation, his contract had been renewed. [See Docket No. 20-1, Exhibit 3-B, ¶ 4.1 & p. 10.]

127. Love even testified that he "had not a clue of what was in the" documents that he disseminated, which, of course, flies in the face of his email to his brother, in which he specifically asked his brother to confirm receipt of the email.

128. Love testified that he "never opened" any of the emails that he sent to himself and that he no longer has any of the materials that he sent to himself. [Id. at 59:13-18.]

129. Love certified on December 14, 2020, in response to this litigation, that he "caused the destruction of all the originals and copies" of the emails that he sent himself. Docket No. 24-1, Exhibit L.]

130. Love's certification and testimony does not provide any basis to find that Love's brother never accessed the document(s) that Love sent him.

131. Love's certification and testimony does not provide any basis to find that Love's brother does not still have access to the document(s) that Love sent him.

132. Love's certification and testimony does not provide any basis to find that Love did not further misappropriate the documents,

for instance by forwarding them to other individuals from his personal email address. Love skirted around most questions about these emails in his testimony, and to the extent that he did respond to questions, his responses at times were evasive. Love's testimony about the emails that he sent to himself and his brother raises further questions in this Court's mind, and Love's testimony that he "never opened" the emails is unconvincing.

## II.  CONCLUSIONS OF LAW

Sunbelt seeks to enjoin Love from (1) working for EquipmentShare (or any similar competitor) and (2) disclosing, using, or otherwise misappropriating Sunbelt's confidential information and trade secrets.

The Court may issue a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure when the party seeking the injunction demonstrates

> (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief. The failure to establish any element of that test renders a preliminary injunction inappropriate.

Arrowpoint Capital Corp. v. Arrowpoint Asset Mgmt., LLC, 793 F.3d 313, 318-19 (3d Cir. 2015) (internal citations and quotations omitted); see also, Glossip v. Gross, 576 U.S. 863, 876 (2015) ("A plaintiff seeking a preliminary injunction must establish that he

is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.") (quoting Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 20 (2008)). On an application for a preliminary injunction, a plaintiff need only "make a showing of reasonable probability, not the certainty, of success on the merits." Atlantic City Coin & Slot Serv. Co. v. IGT, 14 F. Supp. 2d 644, 657 (D.N.J. 1998).

According to the Third Circuit,

a movant for preliminary equitable relief must meet the threshold for the first two 'most critical' factors: It must demonstrate that it can win on the merits (which requires a showing significantly better than negligible but not necessarily more likely than not) and that it is more likely than not to suffer irreparable harm in the absence of preliminary relief. If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief. . . . 'How strong a claim on the merits is enough depends on the balance of the harms: the more net harm an injunction can prevent, the weaker the plaintiff's claim on the merits can be while still supporting some preliminary relief.'

Reilly v. City of Harrisburg, 858 F.3d 173, 179 (3d Cir. 2017) (quoting Hoosier Energy Rural Elec. Cooperative, Inc. v. John Hancock Life Ins. Co., 582 F.3d 721, 725 (7th Cir. 2009)).

Here, Sunbelt is pursuing a common law breach of contract claim and claims under the Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq. (the "DTSA"), and the New Jersey Trade Secrets Act,

N.J. STAT. ANN. § 56:15-1 et seq. (the "NJTSA"). [See Docket No. 1, ¶¶ 89-124.] The Court will discuss each in turn.

### A.   Breach of Contract Claim

The Court will first address whether Sunbelt is entitled to the issuance of a preliminary injunction based on its breach of contract claims. The Court's analysis will follow the requirements for a preliminary injunction: (1) a likelihood of success on the merits, (2) that Sunbelt will suffer irreparable harm if the injunction is denied, (3) that granting preliminary relief will not result in even greater harm to Love, and (4) that the public interest favors such relief.

### 1.   Likelihood of Success on the Merits

In New Jersey, a breach of contract claim requires the plaintiff to show: (1) the existence of a valid contract between the parties; (2) the defendant materially breached the contract; (3) the plaintiff suffered damages as a result of the defendant's breach; and (4) the party stating the claim satisfied its contractual obligations. See Frederico v. Home Depot, 507 F.3d 188, 203 (3d Cir. 2007).

When interpreting contracts, courts must "examine the plain language of the contract and the parties' intent, as evidenced by the contract's purpose and surrounding circumstances." State Troopers Fraternal Ass'n of New Jersey, Inc. v. State, 692 A.2d 519, 523 (N.J. 1997). "Contracts should be read 'as a whole in a

fair and commonsense manner.'" Manahawkin Convalescent v. O'Neill,
85 A.3d 947, 958 (N.J. 2014) (citation omitted) (alteration
omitted). "If the language of a contract is plain and capable of
legal construction, the language alone must determine the
agreement's force and effect." Id. at 958-59 (alterations
omitted). But "[e]ven in the interpretation of an unambiguous
contract, [courts] may consider 'all of the relevant evidence that
will assist in determining [its] intent and meaning.'" Id. at 959
(quoting Conway v. 287 Corporate Ctr. Associates, 901 A.2d 341,
346 (N.J. 2006)).

Here, the principal issues involve the breadth and
enforceability of the Non-Compete Clauses (Paragraphs 5.2.4 and
5.2.5) in the Final Agreement between Love and Sunbelt. As noted
above, these Clauses stated that Love

shall not directly or indirectly:

. . . .

5.2.4    compete   with   the   Corporation,   its
successors and assigns by engaging, directly or
indirectly, in the Business as conducted at the
Designated Stores or in a business substantially similar
to the Business as conducted at the Designated Stores,
**within the "Territory,"** as hereinafter defined; or

5.2.5    provide information to, solicit or sell
for, organize or own any interest in . . . , **or become
employed or engaged by, or act as agent for** any person,
corporation, or other entity that is directly or
indirectly engaged in business **in the "Territory"**
. . . , which is substantially similar to the Business
as conducted at the Designated Stores or competitive
with Corporation's Business as conducted at the

> Designated Stores; provided, however, that nothing
> herein shall preclude the Employee from (i) engaging in
> activities or being employed in a capacity that do not
> actually or potentially compete with Corporation's
> Business or (ii) holding not more than one percent (1%)
> of the outstanding shares of any publicly held company
> which may be so engaged in a trade or business identical
> or similar to the Business of the Corporation.[7]

[Docket No. 20-1, Exhibit 3-B, ¶¶ 5.2.4, 5.2.5 (emphases added).]

Central to the present dispute is the Final Agreement's definition of "Territory," which both Non-Compete Clauses invoke:

> the geographical area within a fifty (50) mile radius of
> any of the Corporation's stores in which, or in
> connection with which, Employee was assigned to at any
> time during the twelve (12) month period immediately
> preceding the termination or expiration of this
> Agreement for any reason.

[Id., Exhibit 3-B, at 5.]

### a. The Parties Had a Valid Contract

The first element that Sunbelt must prove for its breach of contract claim is that it and Love had a valid contract. In this instance, that turns on whether or not the Non-Compete Clauses are enforceable. Therefore, the Court's analysis of this element will determine whether the Non-Compete Clauses are enforceable.

### i. Enforceability of the Non-Compete Clauses

New Jersey courts apply "the Solari/Whitmyer test[,] for determining whether a noncompete agreement is unreasonable and

---

[7] "Corporation" is defined as Sunbelt Rentals, Inc., in the Agreement.

therefore unenforceable." Cmty. Hosp. Grp., Inc. v. More, 869 A.2d 884, 897 (N.J. 2005) (quoting Maw v. Advanced Clinical Commc'ns, Inc., 846 A.2d 604, 609 (N.J. 2004)). That test requires the Court to determine three things: (1) "whether . . . the restrictive covenant was necessary to protect the employer's legitimate interests in enforcement, (2) whether it would cause undue hardship to the employee, and (3) whether it would be injurious to the public." Id. (citing Karlin v. Weinberg, 390 A.2d 1161, 1166 (N.J. 1978)). "Depending upon the results of that analysis, the restrictive covenant may be disregarded or given complete or partial enforcement to the extent reasonable under the circumstances." Id. (citing Whitmyer Bros., Inc. v. Doyle, 274 A.2d 577, 580-81 (N.J. 1971)). The Court will address each prong in turn.

### 1.    Protecting    Sunbelt's    Legitimate Interests

The first prong requires the Court to determine that the covenants protect the legitimate business interests of the employer. See id. Interpreting New Jersey law, the Third Circuit recently held that no employer has a "'legitimate business interest in preventing competition as such' or simply prohibiting an employee from exercising her 'general knowledge' within the industry." ADP, LLC v. Rafferty, 923 F.3d 113, 121 (3d Cir. 2019) (quoting Whitmyer, 274 A.2d at 580). The Third Circuit continued,

however, that "New Jersey courts have stressed that employers have 'patently legitimate' interests in [protecting] their trade secrets, confidential business information, and customer relationships." Id. (quoting Whitmyer, 274 A.2d at 581). "As long as the restrictive covenant reasonably protects [at least] one of these matters, the employer has adduced a 'strong' business interest." Id. (quoting Ingersoll-Rand Co. v. Ciavatta, 542 A.2d 879, 892 (N.J. 1988)).

Here, Love does not seem to dispute that the Non-Compete Clauses in the Final Agreement seek to protect Sunbelt's legitimate business interests. Love was hired to a high-ranking position and, unlike many of his coworkers, had access to information about Sunbelt's customers, pricing strategies, business development strategies, sales tactics, and project information, in addition to other proprietary and confidential information. Indeed, Love appreciated the value of this information, given his decision to email much of it to himself and his brother immediately before his resignation. The Non-Compete Clauses clearly sought to protect those particular interests. Therefore, as a matter of well-established New Jersey law, the Court finds that the first prong of the Solari/Whitmyer test is satisfied.

### 2.   Undue Hardship to Love

The second prong of the Solari/Whitmyer test calls for the Court to "balance the employer's need for protection and the

hardship on the employee that may result" from the non-compete clause. Id. at 126 (quoting Ingersoll-Rand, 542 A.2d at 894). In doing this, the Court will consider three factors: the Non-Compete Clauses' "duration, [their] geographical limits, and the scope of activities [they] prohibit." See Cmty. Hosp., 869 A.2d at 897. Although only the second factor is contested, the Court will address each in turn.

### a.   Duration

Love does not argue that the duration is unreasonable, and for good reason: courts in New Jersey regularly uphold covenants not to compete for up to two years, especially for high-ranking employees. See, e.g., id. at 897-98 (finding reasonable a duration of two years); Acteon, Inc. v. Harms, No. 20-14851, 2020 WL 6694411, at *11 (D.N.J. Nov. 6, 2020) (finding reasonable a duration of one year); ADP, LLC v. Pittman, Civ. No. 19-16237, at *17 (D.N.J. Oct. 18, 2019) (finding reasonable a duration of one year). Like the employees in those cases, Love was high-ranking at Sunbelt. In line with those cases, among others, the Court will find that the Non-Compete Clauses' duration of one year is reasonable.

### b.   Geographical Limits

The Clauses' geographical limits is the central dispute in this case. Sunbelt contends that the restrictive covenant is national in scope. Love responds that based on the plain language,

the restrictive covenant applies only within a 50-mile radius of the Paulsboro store, PC 1092 to which Love was assigned and any effort to expand the definition of "Territory" to a national territory defined by job duties or customers fails as a matter of law.

Because of the parties' different interpretations of the definition of "Territory," the Court must first address the diverse interpretations. Only when the Court has determined what, in fact, the geographical limitations of the Non-Compete Clauses are can it determine whether or not those limitations are reasonable.

The contract language provides:

> the geographical area within a fifty (50) mile radius of any of the Corporation's stores in which, or in connection with which, Employee was assigned to at any time during the twelve (12) month period immediately preceding the termination or expiration of this Agreement for any reason.

[Docket No. 20-1, Exhibit 3-B, at 5.]

Three key words or phrases that constitute the basis for the parties' differing interpretations: "stores," "assigned to," and "in connection with." The principal issue with the definition of "Territory" is that it uses the phrase "stores in which, or in connection with which, Employee was assigned to," but it does not define "stores," "assigned to," or "in connection with." [See Docket No. 20-1, Exhibit 3-B.] As the evidence has shown, an employee can be designated with respect to a Profit Center and/or

42

a Cost Center. As Brown testified, PCs and CCs are not identical for Sunbelt's purposes. The restrictive covenant makes no distinction between PCs and CCs.

The phrases "assigned to" and "in connection with which" are broad, presumably because of the way that employees do their jobs at Sunbelt. According to testimony from Brown and Love, employees like Love are assigned to customer accounts, who themselves are assigned to the various PCs that they do business with. Simultaneously, employees are internally designated to a particular PC or CC, as Love's HR documents indicate.

Thus, although the restrictive covenant is not the model of clarity, "stores" refers to both PCs and CCs; "assigned to" means the PC(s) or CC(s) that are used to designate an employee in their HR profile; and "in connection with" refers to the PCs and CCs that are associated with the employee's HR-assigned PC(s) and CC(s). No other interpretation, based on the language of the contract, makes sense. If the word "stores" had any other definition, it would be completely meaningless in the terms of this contract, since Sunbelt's stores are internally referred to as PCs and CCs. Moreover, any insistence that, for instance, "assigned to" would somehow include the customer accounts that Love worked on, when those accounts are not referenced in the definition, is unavailing. The definition of "Territory" does not contemplate an employee's customer accounts; it merely

contemplates the store(s) to which the employee is assigned, and those stores in connection with that store. Finally, an overly broad interpretation of "in connection with" to include <u>any</u> store with which the employee had a connection would conflict with other, explicit portions of the definition. It would be contradictory to include language <u>limiting</u> the definition to specific stores to which the employee is assigned, only to then include language that effectively <u>eliminates</u> that limitation by including <u>any</u> store with which the employee is connected. In other words, there would be no need to specifically include that provision — the stores to which the employee is assigned — if the definition then simply included any store that the employee has a "connection with." In sum, the Court finds that "Territory" means, in plain terms: 50 miles from any PC(s) or CC(s) to which the employee was assigned, or in connection with the PC(s) or CC(s) to which the employee was assigned, in the twelve months prior to the termination of the employee's employment.[8]

    Having determined what the clause defining "Territory" means, the Court next resolves (1) what store Love was assigned to and (2) what stores can reasonably be described as "in connection with" that store. The evidence clearly shows that, within a week of

_____

[8] Sunbelt's overly broad construction of "Territory," as described herein, would render Paragraph 5.2.5 superfluous. The Court's construction gives purpose to both Paragraphs 5.2.4 and 5.2.5.

signing the Final Agreement, Love was assigned to Cost Center 0873. The evidence further showed that CC 0873 encompasses approximately 450 Profit Centers. Thus, Paragraph 5.2.4 restricts Love from performing a role in which he competes with Sunbelt anywhere within a 50-mile radius of any of the stores located within CC 0873's jurisdiction. Moreover, Paragraph 5.2.5, a broader provision, prevents Love from working for any company that is engaged in a business "substantially similar" to Sunbelt.[9]

Love argues that there is no writing signed by him that "assigned" him to a store other than PC 1092. Yet, the Agreement requires no such writing, despite explicitly contemplating "[c]hanges in or addition to [Love's] duties or title(s)." [Docket No. 20-1, Exhibit 3-B, ¶ 2.] Moreover, Love's efforts to persuade this Court that he was assigned only to PC 1092 throughout the course of his employment with Sunbelt is disingenuous. Love fights hard for such position because EquipmentShare conducts no business within 50 miles of Paulsboro, New Jersey. Contrary to Love's revisionist testimony, he was not assigned exclusively to PC 1092 within the twelve months prior to his departure from Sunbelt. Love tries to explain away this glaring obstacle by claiming that at the time of signing the Final Agreement and throughout his

---

[9] Although Sunbelt has primarily focused on Paragraph 5.2.4 and not on Paragraph 5.2.5, the Court separately analyzes both Paragraphs in light of their distinct ramifications.

employment, Love was assigned to PC 1092. True, he initially refused to sign any non-compete provision that would have limited him outside of Paulsboro because Sunbelt was not offering him a national role. But that all changed when at some point in the negotiations, it was made clear and Love understood that he would have a national role notwithstanding the Offer Letter's PC 1092 placeholder designation.

As the Court has already established, Love's testimony to the contrary is not credible. Brown, whose testimony was credible, testified that there would have been no way that Sunbelt would have agreed to such limited non-compete clauses (a 50-mile radius from Paulsboro, New Jersey) since it was offering Love a national role. Both provisions of the Non-Compete Clauses reflect this understanding. Paragraph 5.2.4 restricts Love from working in a role that competes with Sunbelt within 50 miles of any store associated with CC 0873. Broader still, Paragraph 5.2.5 precludes Love from working for any Sunbelt competitor who engages in "substantially similar . . . Business" within 50 miles of any store associated with CC 0873. In the end, the Defendant got what he bargained for and he was aware of the ramifications of the contract that he signed. He was represented by counsel, and negotiations spanned approximately seven draft agreements over the course of approximately two weeks.

In addition to the pre-agreement negotiations, Love's employment also demonstrates that Love understood the national scope of the Non-Compete Clauses, particularly Paragraph 5.2.5. He was among the highest paid employees at Sunbelt. He was permitted to move to California within a year of starting with Sunbelt. He travelled across the country for his job. He reported to Brown, as opposed to managers in the Paulsboro store or district. And, as Love testified, he intended to spend the rest of his career at Sunbelt, a factor that supports the conclusion he had a significant role in the company similar to the national role he had at Interstate. In short, it seems obvious that despite his initial misgivings, Love agreed to broader Non-Compete Clauses because he succeeded in obtaining what he wanted from Sunbelt: a national role.

Love is now attempting to sow confusion where none exists. His testimony that he was concerned about not getting a national role "to start" is convenient, since, in the most technical sense, he was assigned to PC 1092 for his first week of employment. But that convenient testimony is not credible, given the by-now belabored point that Love knew his role was national in nature from day one. His reliance on the Final Offer Letter, which still contained a reference to PC 1092, is belied by the fact that all other references to PC 1092 — including the lines where he was to put his initials — were removed. Within a week, Sunbelt reassigned

47

Love to CC 0873, which the contract permitted it to do, and which was reflected in Love's Workday profile. And, finally, Love was not assigned to PC 1092 in the twelve months prior to his resignation. Rather, he was assigned to CC 0873.

In short, the evidence shows that, through negotiations, Love demanded a national role and was given a national role. It strains credulity that, in light of that reality, the parties would have had a mutual understanding that his Non-Compete Clauses were permanently limited to a 50-mile radius from Paulsboro, New Jersey. Instead, the only reasonable conclusion is that Love knew that he was signing broader Non-Compete Clauses in exchange for, in part, a national role that paid him handsomely.[10]

Therefore, the correct interpretation of "Territory," as it applies to Love, is anywhere within a 50-mile radius of any store encompassed by Cost Center 0873, which is the store to which he was assigned for the twelve months prior to his resignation. The

---

[10] While Love's interpretation of the Non-Compete Clauses is incorrectly narrow, Sunbelt's interpretation is exceedingly broad. Sunbelt attempts to stretch the phrase "in connection with" to mean that any store that Love had any connection with beyond his assignment to CC 0873 is encompassed by the Non-Compete Clauses, and therefore he cannot work for a competitor within 50 miles of any of those stores. But this, too, misconstrues the Non-Compete Clauses. Although it is true that Love's work was more tied to customer accounts than to physical stores, that is not how Sunbelt and Love decided to define "Territory." Because the Court finds Paragraph 5.2.5 enforceable for the reasons set forth herein, Sunbelt's impermissibly broad interpretation of Paragraph 5.2.4 is not fatal to its case.

Court must now consider whether the restrictive covenants'
geographic limits are reasonable. Initially, they are limited to
areas in which Sunbelt actually conducts business. Cf. Automobile
Club of S.N.J. v. Zubrin, 12 A.2d 369, 370 (N.J. Super. Ct. Ch.
Div. 1940). Moreover, the geographic scope "is no broader than
necessary to protect the employer's interests." See Cmty. Hosp.,
869 A.2d at 897. The fact that the geographic scope will be applied
nationally given the facts of this case does not render it
unreasonable. New Jersey courts have enforced broad non-compete
clauses, for instance nationwide or even global clauses, in
circumstances similar to these. See, e.g., Acteon, 2020 WL 6694411,
at *5, *7 (finding a nationwide geographic limitation reasonable
under New Jersey law); Synthes, Inc. v. Gregoris, 228 F. Supp. 3d
421, 432 (E.D. Pa. 2017) (finding a global geographic limitation
reasonable under New Jersey law).

For instance, in Acteon v. Harms, defendant Joseph Harms was
plaintiff Acteon's Chief Operating Officer, a "high-level
executive position" that made Harms "an integral part of Acteon's
management, commercial development, and product research and
development." Acteon, 2020 WL 6694411, at *7. Acteon "entrusted
[Harms] with the most coveted information for the prosperity of
the business and Acteon's current and future business development
strategies." Id. His role was of a national and even international
nature. Id. at *2. He agreed to a national non-compete clause and

received "ample consideration" for doing so. See id. at *6 n.10, *12. The Court ultimately held that, in light of the facts of that case, a national non-compete clause was enforceable and granted a preliminary injunction in part on that basis. See id. at *12.

Looking at the facts of this case, see Nat'l Reprographics, Inc. v. Strom, 621 F. Supp. 2d 204, 224 (D.N.J. 2009), this Court notes substantial similarities between Love and Harms. Love was in a national role. He negotiated broad Non-Compete Clauses and received ample consideration for agreeing to the Final Agreement. He had access to Sunbelt's trade secrets, which were critical to their nationwide business interests. Therefore, like the Court in Acteon, this Court finds that the nationwide geographic limitations of the Non-Compete Clauses are reasonable and enforceable.[11]

---

[11] The Court notes that, had the Court agreed with Love that his assignment was limited to PC 1092, it is likely that he would not have been precluded from working for EquipmentShare altogether. First of all, the Court has not been presented with any evidence that EquipmentShare in fact competes with Sunbelt within 50 miles of PC 1092 in Paulsboro, New Jersey. Moreover, if Love's role was in fact limited to PC 1092, the Court would likely have found the Non-Compete Clauses' geographical limitations to be overly broad. See Sunbelt Rentals, Inc. v. Spring, No. 3:18-cv-334, 2018 WL 11242773 (E.D. Tenn. Nov. 19, 2018). While Sunbelt Rentals, Inc. v. Spring is not binding on this Court, its logic applies here. In that case, the Court stated that

> [t]he language "in which, or in connection with which, Employee performed or was responsible for performing services," does not clearly indicate that an employee will be deemed to have worked in connection with a store

c.    Scope of Prohibited Activities

Next, the Court turns to the third and final undue hardship factor: the scope of prohibited activities. The New Jersey Supreme Court has established that "the likelihood of the employee finding other work in his or her field" is an important consideration for this factor. See Cmty. Hosp., 869 A.2d at 898. It is also important to consider, particularly with this factor, "the reason for the termination of the parties' relationship." Id. To wit, "[i]f the employee terminates the relationship, the court is less likely to find undue hardship as the employee put himself or herself in the position of bringing the restriction into play." Id.

The limitations here are relatively broad, insofar as they restrict Love from working with a direct competitor of Sunbelt. However, the Clauses do allow for some flexibility, such as working for a competitor in a non-competitive role. Therefore, while Love may not be able to perform any job that he wishes to perform, his

---

when he merely coordinates with another store's sales representatives to serve customers in a different market, or where he assists an out-of-area customer in his own market area.

Id. at *4. While that language is not precisely the same as the language that appears in the Final Agreement (and is actually the language that was included in the Original Agreement), the concern articulated by that Court applies here. Interpreting "in connection with" to effectuate a nationwide covenant despite a very localized role would not be sustainable because the language would not have "clearly indicate[d]" the parameters of the Non-Compete Clauses, just like they failed to do in Spring.

quandary is limited by the other factors that the Court has considered. And, it is worth noting, Love voluntarily resigned from Sunbelt, thereby bringing any hardships upon himself. As such, the Court finds that the scope of activities prohibited by the Non-Compete Clauses is reasonable.

Therefore, having considered all three factors with respect to the undue burden prong of the Solari/Whitmyer test, the Court finds that the Non-Compete Clauses, as defined herein, do not result in an undue burden on Love that exceeds what is necessary to protect Sunbelt's legitimate business interests.

### 3.    Injurious to the Public

Finally, the Court considers whether enforcement of these Non-Compete Clauses would be injurious to the public. The Court finds that the enforcement of mutually agreed to Non-Compete Clauses that protects legitimate business interests and does not overly burden the employee, who decided to resign of his own accord, is in the public interest. Indeed, to not enforce such a clause would be more injurious to the public, who has an interest in free markets and the right to contract. Moreover, the Court finds that, unlike some professions such as doctors, the public is not harmed in this instance by the limitations imposed on Love, on whose services the public does not typically rely on for, as an example, life-sustaining care.

### ii.  Conclusion

All that to say: the parties had an enforceable contract. Sunbelt is therefore likely to succeed in establishing the first element of its breach of contract claim. The Court will now turn to the remaining elements.

### b.  Love Materially Breached

The second element that Sunbelt must prove is that Love materially breached the contract. This can be proven in one of two ways, according to the Non-Compete Clauses. First, the Court could find that Love's employment with EquipmentShare constitutes

> compet[ing] with [Sunbelt] . . . by engaging, directly
> or indirectly, in the Business as conducted at the
> Designated Stores or in a business substantially similar
> to the Business as conducted at the Designated Stores,
> within the "Territory."

[Docket No. 20-1, Exhibit 3-B, ¶ 5.2.4.} Second, the Court could find that Love's employment with EquipmentShare constitutes

> becom[ing] employed or engaged by . . . any . . .
> corporation[] or other entity that is directly or
> indirectly engaged in business in the "Territory"
> . . . , which is substantially similar to the Business
> as conducted at the Designated Stores or competitive
> with Corporation's Business as conducted at the
> Designated Stores.

[Id., Exhibit 3-B, ¶ 5.2.5.]

The first of the Non-Compete Clauses is less restrictive than the second. That is because the first Clause only precludes Love himself from competing with Sunbelt within the Territory. That is to say that, under the first Clause, Love could theoretically work

for a Sunbelt competitor so long as his role with that competitor did not include any work within 50 miles of any CC 0873 store. Conversely, the second Clause precludes Love <u>altogether</u> from working for a corporation that competes with Sunbelt in the Territory. In other words, regardless of Love's actual role, he cannot work for any corporation or entity that competes with Sunbelt in approximately the eastern third of the continental United States.

Given the terms of the Clauses and the meaning of Territory as outlined above, the Court finds that Love's employment with EquipmentShare constitutes a breach of contract. EquipmentShare is indisputably a Sunbelt competitor that is engaged in "substantially similar" business as Sunbelt within 50 miles of any of Sunbelt's stores associated with CC 0873. Therefore, the Court finds that Sunbelt is likely to succeed in showing that Love materially breached the contract.[12]

---

[12] The Court notes that Paragraph 5.2.5 does carve out the following exception: "[N]othing herein shall preclude the Employee from (i) engaging in activities or being employed in a capacity that do not actually or potentially compete with Corporation's Business." [Docket No. 20-1, Exhibit 3-B, ¶ 5.2.5.] Nevertheless, the Court has not been presented with any evidence to suggest that Love could work in a role at EquipmentShare that would be non-competitive as to Sunbelt. And, even if it were possible, it would not affect the scope of the Court's injunction, given that it will also be issuing the injunction on the trade secrets grounds, as discussed below.

### c.   Sunbelt Suffered Damages

The New Jersey Supreme Court has held that "the general rule is that whenever there is a breach of contract, or an invasion of a legal right, the law ordinarily infers that damage ensued, and, in the absence of actual damages, the law vindicates the right by awarding nominal damages." Nappe v. Anschelewitz, Barr, Ansell & Bonello, 477 A.2d 1224, 1228 (N.J. 1984) (internal citation omitted). "Similarly, the Third Circuit, following the New Jersey Supreme Court and the Second Restatement [of Contracts], has found that 'in a breach of contract [claim] the injured party is entitled to nominal damages even when its proof fails to show substantial loss.'" Interlink Grp. Corp. USA v. Am. Trade & Fin. Corp., No. 12-6179, 2014 WL 3578748, at *7 (D.N.J. July 18, 2014) (quoting Norwood Lumber Corp. v. McKean, 153 F.2d 753, 755 (3d Cir. 1946)). In light of such decisions, courts in this District will allow "breach of contract claims to proceed despite proof of actual damages." Id. (collecting cases).

Here, the Court finds that Sunbelt has suffered at least nominal damages. With that being said, the Court is not finding that Sunbelt only suffered nominal damages. However, for the purposes of this analysis, the Court need not make any further finding than that Sunbelt is likely to succeed on its assertion that Love breached the contract. As a result, no finding of substantial damages is required to prove its breach of contract

claim. Therefore, the Court finds that Sunbelt is likely to succeed in satisfying the third prong of its breach of contract claim.

### d.   Sunbelt Satisfied Its Obligations

There is no dispute that Sunbelt did not satisfy its obligations under the contract. For example, Sunbelt paid Love according to his contract. His contract was automatically renewed after two years, per its terms. While Love is displeased that he never received a "national title," the Court has already held that the parties never negotiated such an agreement. Therefore, Sunbelt's "failure" to give Love a national title is not evidence that Sunbelt failed to satisfy is contractual obligations. As such, the Court finds that Sunbelt is likely to succeed in satisfying the fourth and final element of a breach of contract claim.

Based on the above analysis, the Court finds that Sunbelt is likely to succeed on the merits of its breach of contract claim — the first requirement needed to warrant the issuance of a preliminary injunction. The Court will now turn to the remaining requirements.

### 2.   Irreparable Harm to Sunbelt

Whether Sunbelt will suffer irreparable harm if no injunction is granted is the second "most critical" factor in the preliminary injunction analysis. Reilly, 858 F.3d at 179. "Irreparable harm" is "such [harm] that legal remedies are rendered inadequate." Tilden Recreational Vehicles, Inc. v. Belair, 786 F. App'x 335,

342 (3d Cir. 2019); <u>see also</u> <u>Instant Air Freight Co. v. C.F. Air</u>
<u>Freight, Inc.</u>, 882 F.2d 797, 801 (3d Cir. 1989) ("Harm is
considered 'irreparable' if it is not redressable by money damages
at a later date, in the ordinary course of litigation.") The Court,
in analyzing this requirement, shall consider harm that is future,
not past; likely, not merely possible; and imminent, not simply
remote. <u>See</u> <u>HR Staffing Consultants, LLC v. Butts</u>, 627 F. App'x
168, 173 (3d Cir. 2015); <u>Anderson v. Davila</u>, 125 F.3d 148, 163 (3d
Cir. 1997).

As a court in this District recently wrote,

> Courts in the Third Circuit and this District have had
> no difficulty in finding that the loss of business
> opportunities and goodwill constitutes irreparable harm.
> Likewise[,] New Jersey courts recognize that "the
> diversion of a company's customers may . . . constitute
> irreparable harm. . . . [T]his is so because the extent
> of the injury to the business as a result of this type
> of conduct cannot be readily ascertained, and as such,
> does not lend itself to a straightforward calculation of
> money damages."

<u>ADP, LLC v. Olson</u>, No. 20-03312, 2020 WL 6305554, at *12 (D.N.J.
Oct. 28, 2020) (quoting <u>Fluoramics, Inc. v. Trueba</u>, No. BER-C-408-
05, 2005 WL 3455185, at *8 (N.J. Super. Ch. Div. 2005)).

Here, the failure to issue a preliminary injunction would
permit Love to continue in his role of building up the national
team for one of Sunbelt's direct competitors. Given the access to
confidential and proprietary information that Love had during his
employment with Sunbelt — which will be discussed at some length

below, in the Court's analysis of Sunbelt's trade secrets claims — there is a substantial risk that Love's continued employment with EquipmentShare would jeopardize Sunbelt's business. Since Love was in a national role at Sunbelt, he had access to Sunbelt's national strategies, customer lists, and other vital information that Sunbelt built up over the course of nearly four decades. Even if Love does not still have access to these documents — and the Court is not convinced that this is the case — he spent two years working in a national role for Sunbelt and is likely to have retained vital information. He could use that information to EquipmentShare's advantage, while damaging or reducing Sunbelt's business opportunities, goodwill, and customer base.

Therefore, the Court finds that the type of harm contemplated by Love's continued employment with EquipmentShare is precisely the type of irreparable harm contemplated by courts in this Circuit, District, and state. Sunbelt has adequately shown that it is likely to suffer irreparable harm if a preliminary injunction is not issued.

### 3.   Harm to Love

The third factor to consider is whether the denial of a preliminary injunction would harm Sunbelt more than the issuance a preliminary injunction would harm Love. See Reilly, 858 F.3d at 179. As the Third Circuit has explained,

> a temporary injunction prohibiting someone from pursuing
> his livelihood in the manner he chooses operates as a
> severe restriction on him that a court should not impose
> lightly. Nevertheless, such a temporary restriction on
> his employment is warranted where . . . the facts
> demonstrate that the restriction is necessary to prevent
> greater irreparable harm from befalling another party.

Bimbo Bakeries USA, Inc. v. Botticella, 613 F.3d 102, 119 (3d Cir.

2010). When addressing this prong, courts should weigh "the

likelihood of the employee finding work in his field elsewhere .

. . [and] the reason for the termination of the relationship

between the parties to the employment contract." HR Staffing

Consultants, 627 F. App'x at 172 (quoting Karlin v. Weinberg, 390

A.2d at 1169).

As the Court discussed briefly above when analyzing the

viability of the Non-Compete Clauses, Love would certainly have a

more difficult time finding employment if a preliminary injunction

were issued. But this is the bargain that Love struck. He

negotiated these terms and ultimately, he breached them. He decided

to resign from Sunbelt, knowing the limitations that faced him. It

is only fair that he is now held to those terms.

Further, the Court notes that Love was handsomely paid by

Sunbelt. As a result of the sale of Interstate, Love received

approximately $4,000,000 in 2018. He then received approximately

$650,000 in salary during his time at Sunbelt, plus $100,000 in

annual bonuses and $250,000 in a retention bonus. Love was required

to stay with Sunbelt until at least August 2020 in order to receive

approximately $300,000 of that compensation. Once he did that, he quite promptly left Sunbelt. He received the full benefit of the bargain.

Although not being able to work for EquipmentShare for a year may well cause harm to Love, the Court cannot find that such harm outweighs the harm to Sunbelt. For those reasons, the Court finds that Sunbelt would suffer greater harm if no injunction were issued than Love would if an injunction were issued.

### 4. Public Interest

Finally, the Court must consider whether issuing a preliminary injunction in this case would serve the interest of the public. Courts in this District have rightfully held that "[j]udicial enforcement of non-competition provisions of employment contracts serves the public interest by promoting stability and certainty in business and employment relationships." E.g., Saturn Wireless Consulting, LLC, v. Aversa, No. 17-1637, 2017 WL 1538157, at *18 (D.N.J. Apr. 26, 2017) (quoting Wright Med. Tech., Inc. v. Somers, 37 F. Supp. 2d 673, 684 (D.N.J. 1999)). The public interest in enforcing such a clause is even stronger when, as here, the terms were voluntarily entered into by individuals who, at the time of signing the contract, were knowledgeable businesspeople represented by competent counsel. See Merrill Lynch, Pierce, Fenner & Smith v. Napolitano, 86 F. Supp. 2d 491, 498-99 (E.D. Pa. 2000); see also Fischer Bioservices, Inc.

v. Bilcare, Inc., No. Civ.A. 06-567, 2006 WL 1517382, at *21 (E.D. Pa. May 31, 2006) (citing Napolitano, 86 F. Supp. 2d at 498-99). The issuance of a preliminary injunction serves the public interest when it will "discourage . . . the disavowal of freely contracted obligations." Nat'l Business Servs. v. Wright, 2 F. Supp. 2d 701, 709 (E.D. Pa. 1998) (citation omitted). While there is also a public interest "in employers being free to hire whom they please and in employees being free to work for whom they please," Bimbo Bakeries, 613 F.3d at 119, in this case, the enforcement of the freely entered into Non-Compete Clauses "outweighs the temporary restriction on [Love's] choice of employment," Tilden, 786 F. App'x at 343 (citation omitted).

Moreover, "[a]s a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury," as Sunbelt has done here, "it almost always will be the case that the public interest will favor the plaintiff." Am. Telephone & Telegraph Co. v. Winback & Conserve Program, Inc., 42 F.3d 1421, 1427 n.8 (3d Cir. 1994).

Therefore, the Court finds that, considering the facts of this case, the public interest factors favor the issuance of a preliminary injunction against Love and in Sunbelt's favor.

### 5.   Conclusion

Based on all of the above analysis, the Court finds that issuing a preliminary injunction here is warranted. Sunbelt has

sufficiently shown that it is likely to succeed on the merits of its breach of contract claim, that it is likely to suffer irreparable harm if no injunction is issued, that the harm Love would suffer from the issuance of an injunction is outweighed by the harm Sunbelt would suffer if no injunction were issued, and that the issuance of an injunction is in the public interest. Therefore, the Court will grant Sunbelt's request for a preliminary injunction on its breach of contract claim.[13] The Court will also rule in the alternative on Sunbelt's trade secrets claims, as discussed below.

**B.  Trade Secrets Claims**

The Court turns next to Sunbelt's trade secrets claims. Because, "[f]or courts in this district, the analysis under the DTSA folds into that of [the] NJTSA," the Court will discuss those claims collectively. See Austar Int'l Ltd. v. AustarPharma LLC,

---

[13] The Court will not, however, toll the Non-Compete Clauses' one-year duration as Sunbelt requests. Although the Final Agreement did stipulate that the Restrictive Period would not "include any period of time in which [Love] is in violation of the Restrictive Covenants," [Docket No. 20-1, Exhibit 3-B, ¶ 5.3.3], the Court finds that in this instance enforcing that provision would not be in the interest of justice. First of all, Sunbelt did not file this suit until nearly two full months after Love resigned and started to work at EquipmentShare. [See Docket No. 1.] The Court will not hold dilatoriness against Love. Moreover, a temporary restraining order has been in place since December 5, 2020. [Docket No. 13.] To toll the Clauses' duration such that it effectively lasts thirteen months rather than one year is not in the interest of justice. Therefore, the Court will enforce the Clauses as written: this preliminary injunction will expire on October 2, 2021 — one year after the date that Love resigned.

425 F. Supp. 3d 336, 355 (D.N.J. 2019). As with the breach of contract discussion, the Court's analysis will follow the requirements for a preliminary injunction: (1) a likelihood of success on the merits, (2) that Sunbelt will suffer irreparable harm if the injunction is denied, (3) that granting preliminary relief will not result in even greater harm to Love, and (4) that the public interest favors such relief.

### 1.   Likelihood of Success on the Merits

The Third Circuit has held that, under both the DTSA and the NJTSA, a plaintiff must "demonstrate (1) the existence of a trade secret, defined broadly as information with independent economic value that the owner has taken reasonable measures to keep secret, and (2) misappropriation of that secret, defined as the knowing improper acquisition and use or disclosure of the secret." Par Pharm., Inc. v. Quva Pharma, Inc., 764 F. App'x 273, 278 (3d Cir. 2019) (citing 18 U.S.C. §§ 1836(b)(1), 1839(1); N.J. STAT. ANN. § 56:15-2).

A "trade secret" is defined by the DTSA as

all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing . . . [that] the owner thereof has taken reasonable measures to keep . . . secret; and . . . derives independent economic value, actual or potential,

from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

18 U.S.C. § 1839(3).

"Misappropriation" is defined by the DTSA in relevant

part as

> **(A)** acquisition of a trade secret of another person by a person who knows or has reason to know that the trade secret was acquired by improper means; or

> **(B)** disclosure or use of a trade secret of another without express or implied consent by a person who

>> **(i)** used improper means to acquire knowledge of the trade secret.

Id. § 1839(5).

"Improper means," as defined by the DTSA, "includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means," but "does not include reverse engineering, independent derivation, or any other lawful means of acquisition." Id. § 1839(6).

Considering the definitions of "misappropriation" and "improper means" together, "the DTSA 'contemplates three theories of liability: (1) acquisition, (2) disclosure, or (3) use." Acteon, 2020 WL 6694411, at *9 (quoting Bramshill Investments, LLC v. Pullen, No. 19-18288, 2020 WL 4581827, at *3 (D.N.J. Aug. 10, 2020)).

Similarly, a "trade secret" is defined by the NJTSA as

information, held by one or more people, without regard
to form, including a formula, pattern, business data
compilation, program, device, method, technique, design,
diagram, drawing, invention, plan, procedure, prototype
or process, that:

**(1)** Derives independent economic value, actual or potential,
from not being generally known to, and not being readily
ascertainable by proper means by, other persons who can
obtain economic value from its disclosure or use; and

**(2)** Is the subject of efforts that are reasonable under the
circumstances to maintain its secrecy.

N.J. Stat. Ann. § 56:15-2.

"Misappropriation" is defined in relevant part by the NJTSA
as

**(1)** Acquisition of a trade secret of another by a person who
knows or has reason to know that the trade secret was acquired
by improper means; or

**(2)** Disclosure or use of a trade secret of another without
express or implied consent of the trade secret owner by a
person who:

  **(a)** used improper means to acquire knowledge of the trade
  secret.

Id.

"Improper means" is defined by the NJTSA as

the theft, bribery, misrepresentation, breach or
inducement of a breach of an express or implied duty
to maintain the secrecy of, or to limit the use or
disclosure of, a trade secret, or espionage through
electronic or other means, access that is unauthorized
or exceeds the scope of authorization, or other means
that violate a person's rights under the laws of this
State.

Id.

Synthesizing the above, the DTSA and NJTSA claims require the existence of (1) information that derives independent economic value, that (2) the owner has taken reasonable measures to keep secret, and that (3) the defendant improperly acquired, disclosed, or used.

### a.    The Information Derives Independent Economic Value

Defendant Love admits that the documents the Defendant inappropriately forwarded from his Sunbelt email address to his personal email address and to his brother contained information including customer lists, pricing, and other confidential information. Sunbelt has shown how these documents are part of Sunbelt's business strategy in setting itself apart from other competitors nationwide. Such information indisputably constitutes trade secrets. See, e.g., Corp. Synergies Grp., LLC v. Andrews, No. 18-13381, 2019 WL 3780098, at *4 (D.N.J. Aug. 12, 2019) ("Customer lists, pricing information, and marketing techniques constitute trade secrets under [the NJTSA] and the DTSA.") (first citing IDT Corp. v. Unlimited Recharge, Inc., No. 11-4992, 2012 WL 4050298, at *6 (D.N.J. Sept. 13, 2012); then citing Von Rohr Equip. Corp. v. Modern Fasteners Inc., No 16-6675 (2017 WL 9690975, at *1 (D.N.J. May 18, 2017)). Therefore, the first requirement under the DTSA and NJTSA is met here.

**b.    Sunbelt's Efforts to Keep the Information Secret Were Reasonable**

Sunbelt has also established, as required by both the DTSA and the NJTSA, that it took reasonable efforts to protect the information in question by requiring employees, including Love, to sign confidentiality agreements agreeing to never disclose, use, or divulge any of Sunbelt's confidential information. See, e.g., Par Pharm., Inc., 764 F. App'x at 278 (concluding that the employer "took reasonable steps to protect the secrecy of its [trade secrets] through the use of non-disclosure agreements and appropriate facility security measures"). Love does not dispute that he agreed to the following confidentiality agreement upon being hired:

> During the term of this Agreement and after its termination or expiration for any reason, Employee will not, without Corporation's prior written consent, use, divulge, disclose, furnish, or make accessible to any third person, company, or other entity any aspect of Confidential Information, Intellectual Property, or Proprietary Materials for any purpose, including through an online social networking website, except on Corporation's behalf.

[Docket No. 20-1, Exhibit 3-B, ¶ 5.1.] Therefore, the requirement that Sunbelt took reasonable steps to protect the secret information has been satisfied here.

      c.   **Love Inappropriately Acquired, Disclosed, or Used the Trade Secrets**

As discussed above, the relevant acts prohibit the improper acquisition, disclosure, and use of trade secrets. There is no dispute that Love actually acquired and disclosed Sunbelt's trade secrets, as defined by the DTSA and the NJTSA. As a threshold requirement, both of those forms of misappropriation require that the trade secrets were acquired via "improper means." See 18 U.S.C. § 1859(5); N.J. STAT. ANN. § 56:15-2.

Once that has been established, improper acquisition further requires that the defendant "kn[ew] or ha[d] reason to know that the trade secret was acquired by improper means." 18 U.S.C. § 1859(5)(A); N.J. STAT. ANN. § 56:15-2. Similarly, improper disclosure simply requires that the trade secrets were disclosed "without express or implied consent" of the rightful owner of the trade secrets. 18 U.S.C. § 1859(5)(B)(i); N.J. STAT. ANN. § 56:15-2.

Here, it cannot be disputed that Love emailing himself Sunbelt's trade secrets without Sunbelt's consent and in violation of his contract with Sunbelt, immediately prior to Love's resignation from Sunbelt and new employment with EquipmentShare, constitutes "improper means." See 18 U.S.C. § 1859(6); N.J. STAT. ANN. § 56:15-2; see also, e.g., Bimbo Bakeries, 613 F.3d at 107 (holding that an employee absconding with trade secrets

68

immediately prior to his resignation and new employment with a competitor violated Pennsylvania's trade secrets law). Therefore, the threshold requirement that Love acquired these trade secrets through improper means is met.

Next, Sunbelt has also shown, with respect to the improper acquisition grounds, that Love "kn[ew] or ha[d] reason to know that" he acquired Sunbelt's trade secrets "by improper means." See 18 U.S.C. § 1859(5)(A); N.J. STAT. ANN. § 56:15-2. In fact, Love admitted as much when he testified that what he did was "wrong." Therefore, Sunbelt has shown that Love violated both the DTSA and the NJTSA when he misappropriated Sunbelt's trade secrets by emailing them to himself.

The analysis for improper disclosure is similarly straightforward: Love disclosed the trade secrets — which, as discussed above, he "used improper means to acquire" — when he emailed the document(s) to his brother and himself. See 18 U.S.C. § 1839(5)(B)(i), {6}; N.J. STAT. ANN. § 56:15-2. Therefore, Sunbelt has also shown that Love violated both the DTSA and the NJTSA when he misappropriated Sunbelt's trade secrets by emailing them to his brother.

### i.   Inevitable Disclosure

Although the evidence clearly demonstrates that Love improperly acquired and disclosed Sunbelt's trade secrets, Sunbelt correctly contends that it "need not establish that its former

employee has actually used or disclosed trade secrets." Acteon, 2020 WL 6694411, at *9 (quoting Corp. Synergies, 2019 WL 3780098, at *7 n.10). Instead, Sunbelt may rely on the doctrine of inevitable disclosure. Under this doctrine, an employer may meet its burdens under the DTSA and NJTSA simply by "demonstrat[ing] that there is a sufficient likelihood of inevitable disclosure of its trade secrets to a competitor." Id. (quoting Corp. Synergies, 2019 WL 3780098, at *7 n.10); see also Fluoramics, 2005 WL 3455185, at *8.

Here, Sunbelt has met its burden. Although Love argues that no evidence was presented as to any damage or harm to Sunbelt based on Love's misconduct, such argument falls short. Love clearly had access to highly confidential information given his high-ranking position at Sunbelt. He was privy to information that permitted Sunbelt to become a market leader in the rental equipment industry, growing after its acquisition of Interstate due to, in part, efforts of Love. Love admitted that he copied whatever was on his desktop, and he forwarded such documents to his personal email address. Although Love avers under oath that when he sent the emails, he "had not a clue of what was in" the documents he sent, [Docket No. 29, at 99:18-19], and that, in the time since, he deleted and did not retain such documents in response to this Court's temporary restraining order, the Court has little confidence in such testimony absent corroboration. As the Court

has set forth above, it has not found much of Love's testimony to be credible.

Love abruptly left Sunbelt. Immediately thereafter, he joined EquipmentShare to compete with Sunbelt at the national level. Love misappropriated the confidential information of Sunbelt and explained his misappropriation as an act of ego. That Love took these documents "based upon feelings and emotions," [Docket No. 29, at 58:25-59:1], while admitting to Brown that he left Sunbelt to help build a national platform for EquipmentShare, is troubling. The Court does not find Love's testimony that he did not open the emails containing Sunbelt's trade secrets credible. At best, such testimony was "half the truth." Although Love admitted that he sent the documents to his brother, the testimony regarding his reason for doing so was evasive and defensive. Love's efforts to obfuscate the record and dodge questions is exemplified by this exchange, which is but one of many like it, during his cross examination:

> Q: [Fair] to say though that Scott Love was not employed by Sunbelt when you sent this to him?
> A: It's fair to say that he's a customer now of Sunbelt, because of me.

[Id. at 103:9-12.]

The above facts illustrate both improper acquisition and improper disclosure by Love not only to a family member, but a family member who works for a current customer of Sunbelt and a

target customer for EquipmentShare. To conclude that there is not a substantial likelihood that Love will inevitably disclose Sunbelt's trade secrets to EquipmentShare would give far too much credence to Love's incredible testimony, and far too little credence to the evidence and credible testimony presented against him. The Court gives little weight to Defendant's claim that he has not, and presumably will not, use Sunbelt's trade secrets, given all of the information that has been presented to it. Therefore, the Court finds that there is a substantial likelihood that Love will inevitably disclose Sunbelt's trade secrets to EquipmentShare.

Based on the above analysis, the Court finds that Sunbelt is likely to succeed on the merits of its claims under the DTSA and the NJTSA. The Court now turns to the irreparable harm prong.

### 2.   Irreparable Harm to Sunbelt

The same standard for irreparable harm that the Court outlined in its discussion of Sunbelt's breach of contract claim applies here. In considering that standard, it is clear that without the benefit of further discovery and the issuance of an injunction, Sunbelt would have to trust the testimony of a disgruntled former employee who has demonstrated his animus toward his former employer. Because this Court has questions as to Love's credibility, it will not make Sunbelt proceed on blind trust. It is apparent to the Court that Love wanted to "get even" with

Sunbelt — for refusing to give him a national title (as opposed to role) and commissions, among other reasons — by attempting to transform his new employer, EquipmentShare, into a nationwide competitor. He admitted as much in his text message to Brown. The Court is not satisfied that, absent further discovery, the full extent of the risk of harm to Sunbelt can be appreciated. For instance, forensic analysis may be required to determine whether, and to what extent, Love disseminated Sunbelt's trade secrets beyond the emails that he sent to himself and to his brother. If Love were permitted to remain at EquipmentShare while having access to Sunbelt's customer lists, pricing information, and the like, there is the likelihood of irreparable harm to Sunbelt's relationships with its customers. For instance, if Love were to use such information to interfere with Sunbelt's contracts or customer relationships, Sunbelt would be irreparably harmed. Indeed, as an example, one of the documents, [see Exhibit P-M], was a bid drafted by Sunbelt that contained the customer's (PBF Refinery) unique requirements. Such document could be used by Love to negotiate with that customer to strike a better deal.

As outlined above, this type of damage is precisely what the Third Circuit, the District of New Jersey, and New Jersey state courts consider irreparable harm in the preliminary injunction context. See Acteon, 2020 WL 6694411, at *10 (collecting cases); see also Nat. Starch & Chem. v. Parker Chem. Corp., 530 A.2d 31,

33 (N.J. App. Div. 1987) ("[D]amages will not be an adequate remedy when the competitor has obtained the secrets. The cat is out of the bag and there is no way of knowing to what extent their use has caused damage or loss."). Were Love permitted to work at EquipmentShare in spite of the fact that he stole Sunbelt's trade secrets, future irreparable harm to Sunbelt would be likely and imminent. Defendant Love asks this Court, in essence, to absolve him of his wrongdoing because he did make use of the documents, turned them over to his counsel, and deleted them from his files. Unfortunately, the Court did not find Defendant's testimony convincing. Therefore, the second requirement for issuing a preliminary injunction is met.

### 3.  Harm to Love

The same standard for considering the harm to Love that the Court outlined in its discussion of Sunbelt's breach of contract claim applies here. In considering that standard, the Court finds that the denial of a preliminary injunction would harm Sunbelt more than the issuance of a preliminary injunction would harm Love. The harm that Sunbelt would suffer if no preliminary injunction were issued is discussed above. The Court does not take lightly the fact that the issuance of a preliminary injunction would cause hardship to Love. For instance, he would not be permitted to work

at his preferred job and may suffer a loss of income.[14] However, as the Third Circuit has recognized and as this Court discussed above, the "injury a defendant might suffer if an injunction were imposed may be discounted by the fact that the defendant brought that injury upon himself." Kos Pharms., Inc. v. Andrx Corp., 369 F.3d 700, 728 (3d Cir. 2004) (quoting Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co., 290 F.3d 579, 596 (3d Cir. 2002).

It is clear in this case that Love brought this injury upon himself through his unlawful acts. Love has admitted to this. Until the full extent of the damage done to Sunbelt by Love's misconduct can be explored through discovery, the Court is unwilling to risk the potential of irreparable damage to Sunbelt based on the unreliable word of Love. To allow Love to continue his employment because he claims he may suffer some financial harm – which he has not supported – is like "allow[ing] 'a known infringer [that] constructs its business around its infringement' to avoid an injunction by claiming it would have a 'devastating effect' on that business." Id. at 728-29 (quoting Apple Computer, Inc. v. Franklin Computer Corp., 714 F.2d 1240, 1255 (3d Cir. 1983)). That, as the Third Circuit has held, would constitute "a result we cannot

_____

[14] Love did not testify to the harm that he would suffer if a preliminary injunction were issued, nor does his Proposed Findings of Fact and Conclusions of Law address such harm. [See Docket Nos. 27, 29, 34.]

condone." Id. (quoting Apple, 714 F.2d at 1255). Love took a risk by misappropriating Sunbelt's trade secrets, quitting his job with Sunbelt, and going to work for a Sunbelt competitor for the express purpose of competing with Sunbelt. The Court does take note of the salary and bonuses that Love negotiated and cashed in on during his time at Sunbelt. Those considerations would seem to reduce the burden that the issuance of an injunction would have on Love.

Therefore, the balance of the harms in this case favors the issuance of a preliminary injunction.

### 4.   Public Interest

Finally, the Court must consider whether issuing a preliminary injunction in this case would serve the interest of the public. As a general rule, "[t]he public has an interest in safeguarding an employer's confidential information." HR Staffing Consultants v. Butts, No. 2:15-3155, 2015 WL 3492609, at *14 (D.N.J. June 2, 2015). Moreover, "there is a generalized public interest in 'upholding the inviolability of trade secrets and enforceability of confidential agreements.'" Bimbo Bakeries, 613 F.3d at 119 (quoting Bimbo Bakeries USA, Inc. v. Botticella, No. 10-0194, 2010 WL 571774, at *16 (E.D.P.A. Feb. 9, 2010)).

While, as noted above, there is also a public interest "in employers being free to hire whom they please and in employees being free to work for whom they please," Bimbo Bakeries, 613 F.3d at 119, this Court finds that, in this case, the protection of

confidential information "outweighs the temporary restriction on [Love's] choice of employment," Tilden, 786 F. App'x at 343 (citation omitted).

Moreover, again as noted above, "[a]s a practical matter, if a plaintiff demonstrates both a likelihood of success on the merits and irreparable injury," as Sunbelt has done here, "it almost always will be the case that the public interest will favor the plaintiff." Am. Telephone & Telegraph Co., 42 F.3d at 1427 n.8. Therefore, the Court finds that, considering the facts of this case, the public interest factors favor the issuance of a preliminary injunction against Love and in Sunbelt's favor.

### 5. Conclusion

In light of the above analysis, the Court finds that Sunbelt's trade secrets claims warrant the issuance of a preliminary injunction. Sunbelt has sufficiently shown that it is likely to succeed on the merits of its trade secrets claims, that it is likely to suffer irreparable harm if no injunction is issued, that the harm Love would suffer from the issuance of an injunction is outweighed by the harm Sunbelt would suffer if no injunction were issued, and that the issuance of an injunction here is in the

public interest. Therefore, the Court will grant Sunbelt's request for a preliminary injunction on its trade secrets claims.[15]

## III. CONCLUSION

In sum, the Court finds that Sunbelt has met its burden with respect to the issuance of a preliminary injunction on its breach of contract claim. As a result, the Court will issue a preliminary injunction that enjoins Love from working for Sunbelt's competitor, EquipmentShare.

In the alternative, the Court finds that Sunbelt has met its burden with respect to the issuance of a preliminary injunction on its claims under the DTSA and NJTSA. Therefore, the Court will issue a preliminary injunction that enjoins Love from working for EquipmentShare pending further discovery to establish that the documents detailing trade secrets that Love misappropriated have, in fact, been deleted from Love's possession and from the possession of anyone who came into possession of them as a result of Love's actions.

---

[15] The Court notes that its decision to issue a preliminary injunction on the trade secrets claims is consistent with Third Circuit precedent. In Bimbo Bakeries USA, Inc. v. Botticella, the Circuit affirmed the issuance of a preliminary injunction where the defendant had copied various trade secrets from his work computer in the days and weeks leading up to his resignation and the start of new employment with a direct competitor of his former employer. 613 F.3d at 107, 119. This case being substantially similar to that, and Sunbelt having satisfied its burdens, the issuance of a preliminary injunction on that basis is appropriate.

The preliminary injunction will expire no later than October 2, 2021. An accompanying Order shall issue.

January 11, 2021                    s/Renée Marie Bumb
Date                               Renée Marie Bumb, U.S.D.J.