[Docket No. 42]

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

SUNBELT RENTALS, INC.,

                Plaintiff,

     v.

MICHAEL LOVE,

                Defendant.

Civil No. 20-17611 (RMB/AMD)

**OPINION**

**APPEARANCES**
MICHAEL S. PEPPERMAN
OBERMAYER REBMANN MAXWELL & HIPPEL LLP
200 LAKE DRIVE EAST, SUITE 110
CHERRY HILL, NEW JERSEY 08002

IVO JONATHAN BECICA
OBERMAYER REBMANN MAXWELL & HIPPEL LLP
CENTRE SQUARE WEST
1500 MARKET STREET, SUITE 3400
PHILADELPHIA, PENNSYLVANIA 19102

MATTHEW ADAM GREEN
OBERMAYER REBMANN MAXWELL & HIPPELL LLP
1120 ROUTE 73, SUITE 420
MOUNT LAUREL, NEW JERSEY 08054

     *On behalf of Plaintiff*

ANDREW JOSEPH BELLI
KAUFMAN COREN & RESS PC
2001 MARKET STREET, SUITE 3900
PHILADELPHIA, PENNSYLVANIA 19103

KEVIN HARRY MARINO
MARINO TORTORELLA & BOYLE, PC
437 SOUTHERN BOULEVARD
CHATHAM, NEW JERSEY 07928

     *On behalf of Defendant*

**RENÉE MARIE BUMB, United States District Judge**

This matter comes before the Court upon Defendant Michael Love's Motion to Stay (the "Motion"). [Docket No. 42.] For the reasons expressed herein, the Court will deny Love's Motion.

I.   **BACKGROUND**

As the parties are familiar with the facts underlying this case, the Court will refrain from reiterating them in detail. The Court incorporates its January 11, 2021 Findings of Fact and Conclusions of Law, with the exceptions outlined herein. [Docket No. 36.] The relevant procedural background in this case is as follows. Plaintiff Sunbelt Rentals, Inc., filed this suit on December 1, 2020, alleging that Love's new employment violated his non-compete clauses (the "Non-Compete Clauses" or "Clauses") and that Love misappropriated Sunbelt's trade secrets in violation of the Defend Trade Secrets Act ("DTSA") and the New Jersey Trade Secrets Act ("NJTSA"). Sunbelt sought a Preliminary Injunction, which the Court granted on January 11, 2021, after conducting two hearings and considering the parties numerous briefs and filings. [See Docket Nos. 36, 37.] The Court's Order enjoined Love "from being employed by [his then-employer] EquipmentShare . . . until October 2, 2021, or until further order of the Court, whichever comes first." [Docket No. 37, at 1.]

On February 5, 2021, Love appealed the Court's ruling and filed the pending Motion to Stay. [Docket Nos. 41, 42.] Sunbelt

timely filed a response in opposition to Love's Motion on March 1, 2021. [Docket No. 48.] Love timely replied on March 8, 2021. [Docket No. 51.] The Court held Oral Argument on the Motion on April 28, 2021. [Docket Nos. 65, 66.]

## II. JURISDICTION

Per Rule 62(d) of the Federal Rules of Civil Procedure, "[w]hile an appeal is pending from an interlocutory order or final judgment that grants, continues, modifies, refuses, dissolves, refuses to dissolve or modify an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights." Per Rule 8(a)(1)(C) of the Federal Rules of Appellate Procedure, a "party must ordinarily move first in the district court for . . . an order suspending, modifying, restoring, or granting an injunction while an appeal is pending." Those Rules collectively establish that this Motion is properly before the Court, as the Motion seeks a stay of an injunction while an appeal is pending.

## III. STANDARD OF REVIEW

"Whether a court will issue a stay is a question of judicial discretion that depends on the circumstances of the case before the court." Druding v. Care Alternatives, 1:08-cv-2126-NLH-AMD, 2019 WL 5957403, at *2 (D.N.J. Nov. 13, 2019) (citing Nken v. Holder, 556 U.S. 418, 433-34 (2009)). "The party requesting a stay bears the burden of showing that the circumstances justify an

exercise of that discretion." Nken, 556 U.S. at 433-34. In deciding
how to exercise its discretion, the Court "is to be guided by [the
following] sound legal principles":

> (1) whether the stay applicant has made a strong showing
> that he is likely to succeed on the merits; (2) whether
> the applicant will be irreparably injured absent a stay;
> (3) whether issuance of the stay will substantially
> injure the other parties interested in the proceeding;
> and (4) where the public interest lies.

Id. (first quoting Martin v. Franklin Capital Corp., 546 U.S. 132,
139 (2005); then quoting Hilton v. Braunskill, 481 U.S. 770, 776
(1987)). The Supreme Court has noted the "substantial overlap
between these and the factors governing preliminary injunctions."
Id. This is "not because the two are one and the same, but because
similar concerns arise whenever a court order may allow or disallow
anticipated action before the legality of the action has been
conclusively determined."

The Supreme Court has stated that "[t]he first two factors of
the traditional standard" outlined above — that is, (1) whether
the applicant is likely to succeed on the merits and (the "merits"
factor) (2) whether the applicant will be irreparably harmed absent
a stay (the "irreparable harm" factor) — "are the most critical."
Id. "It is not enough that the chance of success on the merits be
'better than negligible.'" Id. (quoting Sofinet v. INS, 188 F.3d
703, 707 (7th Cir. 1999)). "By the same token, simply showing some
'possibility of irreparable injury' fails to satisfy the second

4

factor" because it is "too lenient." Id. (internal quotations omitted) (first quoting Abbassi v. INS, 143 F.3d 513, 514 (9th Cir. 1998); then quoting Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 24 (2008)). It follows, then, that "[a] stay pending appeal . . . is an extraordinary remedy." See Conestoga Wood Specialties Corp. v. Sec'y of HHS, No. 13-1144, 2013 WL 1277419, at *1 (3d Cir. Feb. 8, 2013).

## IV.  ANALYSIS

The bulk of Love's argument, both in his briefs and at Oral Argument, addresses the likelihood of success factor. [See Docket No. 42-1, at 14-32.] His arguments address each of the two separate and distinct bases for the Court's decision to grant the Preliminary Injunction: the Non-Compete Clauses and Love's misappropriation of Sunbelt's trade secrets. [See id.] His briefs also address the other three factors listed above. [See id. at 33-34.] The Court will address each factor in turn.

### A.  Likelihood of Success

Love argues that he is likely to succeed on appeal with respect to both the Non-Compete Clauses and the misappropriation of trade secrets. The Court will discuss the Non-Compete Clauses before turning to the trade secrets.

#### 1.  Non-Compete Clauses

Love contends that the Court erred in three main ways in its analysis of the Non-Compete Clauses: (1) by "finding that the Final

Offer Letter was not part of the contract between the parties"; (2) by "not finding that PC 1092 in Paulsboro was the only one of Sunbelt's 'Designated Store[s]' to which Love was 'assigned' and that he could not be reassigned or relocated without his express written consent"; and (3) by "concluding that '"stores" refers to both [Profit Centers] and [Cost Centers].'" [Docket No. 42-1, at 14, 22.]

### a.    Final Offer Letter

With respect to Love's first argument – that the Court erred in "finding that the Final Offer Letter was not part of the contract between the parties" – the Court reaffirms its earlier conclusion. As Love points out, the Final Offer Letter states in part that its "provisions are . . . not intended to be binding on either of us unless and until we and you enter into the Employment Agreement attached hereto, containing the substance of this letter." [Docket No. 20-1, Exhibit 3-A.] However, the Court agrees with Sunbelt's argument that the Final Agreement is itself a fully integrated contract that in no way incorporates the Final Offer Letter. [See Docket No. 48, at 24-27.] The Final Agreement includes an integration clause, which states that the "Agreement contains the entire agreement of the parties hereto, and may not be changed or amended orally, but only by agreement in writing." [Docket No. 20-1, Exhibit 3-B, ¶ 15.]

"In general, where a contract contains an integration clause, the parol evidence rule bars the introduction of evidence of extrinsic negotiations or agreements to supplement or vary its terms." Acrocore Exterior Mouldings, LLC v. Dryvit Sys., Civil No. 2:19-cv-22238, 2020 U.S. Dist. LEXIS 216732, at *12 (D.N.J. Nov. 19, 2020). There can be no dispute that the Final Offer Letter and the Final Agreement are separate documents, which is why Love argues that the Final Agreement incorporates the Final Offer Letter. As such, there must be "a high degree of certainty before" the Final Offer Letter "will be deemed to be incorporated by reference in" the Final Agreement. See Bacon v. Avis Budget Grp., Inc., Civ. No. 16-5939, at *22-23 (D.N.J. June 9, 2017); see also Alpert, Goldberg, Butler, Norton & Weiss, P.C. v. Quinn, 983 A.2d 604, 617 (N.J. App. Div. 2009) ("In order for there to be a proper and enforceable incorporation by reference of a separate document, the document to be incorporated must be described in such terms that its identity may be ascertained beyond doubt and the party to be bound by the terms must have had 'knowledge of and assented to the incorporated terms.'") (citation omitted). "Incorporation by reference is proper where the underlying contract makes clear reference to a separate document, the identity of the separate document may be ascertained, and incorporation of the document will not result in surprise or hardship." Beacon Sales Acquisition, Inc. v. Bd. of Trs. of the Teamsters Indus. Emples. Pension Fund,

7

425 F. Supp. 3d 377, 390 (D.N.J. 2019) (quoting Standard Bent Glass Corp. v. Glassrobots Oy, 333 F.3d 440, 447 (3d Cir. 2003)).

Here, the Final Agreement makes no reference whatsoever to the Final Offer Letter, so it cannot be incorporated by reference as outlined above. Moreover, the Final Offer Letter predates the Final Agreement and it is not signed by both parties, so it is not a valid amendment to the Final Agreement per the terms of the Integration Clause, either. Therefore, the Court concludes again that the Final Offer Letter was not part of the contract between the parties.[1]

**b.    Assignment to PC 1092 and Reassignment Requirements**

Turning to Love's second argument, Love insists that the Court mistakenly concluded "that the Final Agreement removed all references to PC 1092 in Paulsboro that had appeared in prior drafts of the agreement . . . and that Sunbelt could relocate Love from PC 1092 without even giving him affirmative notice of that change, much less obtaining his written consent to it." [Id. at 14-15 (citing Docket No. 36, ¶¶ 41, 61 & pp. 45, 47).] The Court recognizes that its finding of fact that the Final Agreement

---

[1] The Court notes that even if the Final Offer Letter were part of the Final Agreement, its inclusion would not alter the Court's earlier decision. The Court heard credible testimony that Love's initial designation as being assigned to PC 1092 was simply a placeholder. It stands to reason that any reference to PC 1092 in the Final Offer Letter is subject to the same characterization.

contained no reference to PC 1092 was erroneous. Schedule 1 to the Final Agreement, which the Final Agreement integrates, explicitly refers to PC 1092. [See Docket No. 20-1, Exhibit 3-B, at 10-11.] In particular, Paragraph 3 of Schedule 1 provides that Love would receive a Retention Bonus of $250,000 after approximately two years of employment or upon Love's termination of employment for "Good Reason," among other exceptions. [Id. at 10.] "Good Reason" is defined in Paragraph 3(a)(i)(2)(c) to include "a relocation of the Employee's principal place of employment, defined as PC 1092, located at 223 Paulsboro Road, Swedesboro, New Jersey 08085, by more than thirty (30) miles" "without the Employee's express written consent." [Id. at 11.][2]

While Schedule 1 was entered into evidence during the Court's hearings prior to granting the Preliminary Injunction, it was not until the present Motion to Stay that Love raised this particular argument, in spite of the fact that a substantial portion of the previous hearings focused on this very question. It would therefore appear that Love has waived this argument. See Tri-M Grp., LLC, v. Sharp, 638 F.3d 406, 416 (3d Cir. 2011). Regardless, the language in Schedule 1 does not alter the Court's analysis in determining to grant the Preliminary Injunction.

---

[2] The Court notes that this address is not associated with PC 1092, but rather PC 164, where Love never worked. [See Docket No. 48, at 6 n.3.]

First and foremost, the relevant language from Schedule 1 pertains to Love's retention bonus and does not affect the Non-Compete Clauses themselves. That Schedule 1's definition of "Good Reason" includes a reference to PC 1092 being Love's "principal place of employment" is irrelevant to the Non-Compete Clauses because Schedule 1 expressly limits its definitions to Schedule 1: "For purposes of Schedule 1, Paragraph 3(a) <u>only</u> . . . 'Good Reason' means . . . a relocation of the Employee's principal place of employment." [Docket No. 20-1, Exhibit 3-B, at 10-11 (emphasis added) (alterations omitted).] Additionally, the pertinent phrases used in Schedule 1, namely "principal place of employment" and "relocation," do not appear in the Non-Compete Clauses. Instead of "principal place of employment," the Non-Compete Clauses define the relevant Territory as the "stores in which, or in connection with which, Employee was <u>assigned</u>." [<u>Id.</u> at 5 (emphasis added).] Similarly, the Non-Compete Clauses do not contemplate Love's "relocation" at all. As Sunbelt notes in its brief, Love's "work history with Sunbelt readily demonstrates the differences between ['relocation' and 'reassignment']." [Docket No. 48, at 30.] Sunbelt continues, "In June 2019, Defendant physically relocated to California. Defendant was **not** reassigned to different job duties at that time. In fact, Defendant was permitted to relocate to California because it was understood that doing so would not impact his work assignment. Obviously, Defendant could be relocated

10

without being reassigned." [Id. (citations omitted) (emphasis in original).] The Court agrees with this logic.

Moreover, the Court notes that, even if Schedule 1's language applied to the Final Agreement as a whole, as Love argues, and Sunbelt was required to give notice before reassigning Love to CC 0873, then there was an express remedy for Sunbelt's failure to give such notice, which Love did not invoke. According to Love's interpretation, Schedule 1 granted Love the right to quit and receive his Retention Bonus early if Sunbelt reassigned him without his authorization. Love, however, did not invoke this contractual right. Nor is there any indication in the record that Love's decision to ultimately leave Sunbelt had anything at all to do with the fact that he was reassigned to CC 0873. So, assuming arguendo that Sunbelt breached the contract by reassigning Love without his consent, the proper remedy would have been for Love to quit and demand his retention bonus. His choice not to do so is indicative of the fact that "relocation" from his "principal place of employment" is not interchangeable with a change in the "stores in which, or in connection with which, Employee was assigned."

Therefore, because the relevant language from Schedule 1 does not apply to the Non-Compete Clauses, the Court finds that it did not err in determining that Sunbelt did not require Love's consent to be reassigned from PC 1092 to CC 0873. Nor does the Court agree with Love's argument that the factual error regarding Schedule 1's

reference to PC 1092 was "outcome determinative." As Love notes, the Court stated that "had the Court agreed with Love that his assignment was limited to PC 1092, it is likely that he would not have been precluded from working for EquipmentShare altogether." [Docket No. 36, at 50 n.11.] The point to be made is that the record established that Love was actually assigned to CC 0873 for the twelve months prior to his termination, not PC 1092.

### c.  Definition of "Stores"

Finally, Love argues that the Court erred in defining "stores," which affected the geographic breadth of Love's Non-Compete Clauses. [Docket No. 42-1, at 22-25.] According to Love, the Court should not have deemed that "stores" included both PCs and CCs because doing so did not comport with the dictionary definition of "stores," expanded the ordinary meaning of the term, and incorrectly equated customer assignments with store assignments. [See id.] As before, the Court disagrees with these arguments, which were already raised to varying degrees prior to the issuance of the Injunction. The Court considered the context of the Final Agreement and ultimately settled on the definition that most accurately reflected the intentions of the parties based on that context. [Docket No. 36, at 42-44.] In doing so, the Court also made sure to avoid the absurd result of effectively rendering the word "stores" meaningless. [Id.] Love does not now present a compelling argument for an alternate definition of "stores," and

for that reason the Court does not find that this line of argument makes Love likely to succeed on the merits of his appeal.

In sum, Love has not shown a likelihood of success on the merits with respect to the Non-Compete Clauses. Therefore, that factor weighs against issuing a stay pending appeal.

## 2. Trade Secrets

Next, Love argues that "there was a complete failure of proof as to Sunbelt's trade secrets claims – and they provide no support for an injunction." [Docket No. 42-1, at 25 (alterations omitted).] First, he argues that Sunbelt did not "prove a trade secret with legally sufficient specificity and precision." [Id. at 26.] Love argues that the only evidence that Sunbelt offered in support of establishing a trade secret was the testimony of Russ Brown, Sunbelt's Executive Vice President of the Eastern Territory, regarding a series of documents that Love emailed to himself soon before leaving Sunbelt. The Court disagrees. Love himself admitted, both in his testimony before the Court and his certification, that he emailed himself and his brother Sunbelt documents including customer lists, pricing, and other information. [See Docket No. 24-1, Exhibit L, ¶ 1; Docket No. 29, at 102:3-7; Docket No. 36, ¶¶ 111-18.] Brown's testimony about the attachments, which was admittedly imprecise in the instance highlighted by Love, was but a piece of the puzzle in determining whether what Love emailed himself and his brother constituted trade

secrets. On the whole, however, it cannot legitimately be disputed that, based on the evidence before the Court, Sunbelt failed to establish that Love impermissibly emailed trade secrets.

Next, Love argues that the doctrine of inevitable disclosure was misapplied here because Sunbelt "presented no evidence that Love's employment with EquipmentShare entails duties in which the specific information at issue would be useful." [Docket No. 42-1, at 31.] The Court again disagrees. The evidence is clear that Love was in a national role at Sunbelt, that the information he emailed himself and his brother related to Sunbelt customers, and that he was joining EquipmentShare to compete against Sunbelt's national team. The doctrine of inevitable disclosure was not improperly applied here, and Love's arguments do not convince the Court that he is likely to succeed on appeal on that basis.

Finally, Love argues that the Preliminary Injunction is overbroad in prohibiting Love to work for EquipmentShare in any role. [Docket No. 42-1, at 32.] He suggests that "a narrower injunction – targeted to protect against the misuse of Sunbelt's confidential information – would have been more than sufficient and all that could have possibly been justified." [Docket No. 42-1, at 32.] The Court notes, however, that its Opinion granting the Preliminary Injunction on the trade secrets claims only "enjoins Love from working for EquipmentShare pending further discovery to establish that the documents detailing trade secrets that Love

14

misappropriated have, in fact, been deleted from Love's possession and from the possession of anyone who came into possession of them as a result of Love's actions." [Docket No. 36, at 78.] It is unclear to the Court how the Preliminary Injunction could be targeted more narrowly to protect the trade secrets when, in fact, its expiration specifically contemplates the protection of Sunbelt's trade secrets. Love does not specify how the Preliminary Injunction should be narrowed with respect to the trade secrets claims, and he is not likely to succeed on the merits on that basis.

In conclusion, the Court finds that Love has not established that he is likely to succeed on the merits of his appeal with respect to the trades secrets claims.

**B.  Irreparable Harm**

Next, the Court will consider whether Love will be irreparably injured absent a stay. Love's arguments on this factor are succinct, including a sole paragraph in his moving brief: "Absent a stay, Love will suffer immediate and irreparable harm – as his career has ground to a halt during a national pandemic. . . . Simply put, absent a stay of the Court's nationwide injunction, Love will be unable to earn a living for the next ten months." [Docket No. 42-1, at 33; see also Docket No. 51, at 14-15.] In his Reply brief, Love compares his plight to "destroying one's long-term profession," which, he argues, "constitutes irreparable

harm." [Docket No. 51, at 14.] These conclusory statements do nothing to address or alter the Court's prior analysis of irreparable harm. [See Docket No. 36, at 58-60, 74-76.]

The Court notes in particular that Love offers no evidence to support the assertion that the harm is irreparable. First of all, the cases upon which Love relies are inapposite because they involve the permanent loss of jobs that the plaintiffs in those cases had held for "a considerable period of time." Goldhaber v. Foley, 519 F. Supp. 446, 475 (E.D. Pa. 1981); see Dunkin' Donuts Franchised Restaurants LLC v. Mehta, No. CIV.A. 07-0423, 2007 WL 1688710, at *9 (W.D. Pa. Sept. 11, 2007) ("Courts in the Third Circuit have followed the United States Court of Appeals for the Second Circuit in finding that the termination of a long-standing employment or business relationship can result in irreparable harm." (emphasis added)). Here, Love's employment with EquipmentShare was far from "long-standing" or for "a considerable period of time." Rather, his employment lasted no more than a handful of months before the Court's Preliminary Injunction was entered. Moreover, in those cases, the loss of employment was permanent. Here, the Injunction will expire in October 2021, and Love has offered no evidence that EquipmentShare will not reemploy him at that time. In this instance, therefore, Love's (potentially temporary) loss of employment with a particular employer with which he does not have a long-standing relationship does not amount to

16

irreparable harm. Moreover, Sunbelt has posted bond in the amount of lost income that Love will suffer as a result of the Injunction, which renders any such harm entirely reparable. This fact cuts "heavily against a claim of irreparable harm." See Sampson v. Murray, 415 U.S. 61, 90 (1974).

Therefore, for the reasons expressed above as well as the reasons already articulated in the Court's previous Opinion, the Court finds that Love has not established that he will be irreparably injured absent a stay.

### C.   Substantial Injury to Sunbelt

Having already established that Love has not satisfied the first two factors, the Court need not consider the final two. See Revel AC, Inc. v. IDEA Boardwalk LLC, 802 F.3d 558, 571 (3d Cir. 2015). However, in an effort to be thorough, it will do so. First is the question of whether Sunbelt will suffer substantial injury as a result of a stay. The Court previously found that Sunbelt was likely to suffer irreparable harm if the Injunction was not issued. [Docket No. 36, at 56-58.] Love offers no basis to change that analysis now. After all, Love's employment with Sunbelt exposed him to a myriad of confidential information, including client lists, business plans and strategies, and other trade secrets. While Love does allege that – after abusing his access to such information by emailing it to himself as discussed above – he deleted the physical and electronic copies from his possession,

17

that does not change the fact that he is intimately familiar with the relevant information. Given Love's explicit desire to build a team at EquipmentShare that would compete with Sunbelt at a national level, it stands to reason that Sunbelt would be substantially injured if a stay were granted. This, like the Court's analysis in its previous Opinion, cuts against the issuance of the requested stay.

### D.   Public Interest

Finally, the Court considers whether the public interest supports the issuance of a stay pending appeal. Love's argument here is that the Court misinterpreted the parties' employment agreement such that it imposed a restriction to which Love never agreed. If this were true, the Court would agree with Love insofar as the public does not have an interest in a contract being enforced beyond its own terms. However, as discussed above, the Court disagrees with Love's core contention that the Court misinterpreted the Non-Compete Clauses and broadened the parties' agreement. Instead, the Court reiterates that the public interest is served by the Preliminary Injunction for the reasons expressed in the Court's previous Opinion. [See Docket No. 36, at 60-61, 76-77.] Therefore, the public interest would not be served by issuing a stay pending appeal. [See Docket No. 36, at 60-61, 76-77.]

**V.    CONCLUSION**

The Court concludes that all four of the relevant factors weigh against issuing a stay pending appeal. Therefore, for the reasons expressed above, the Court will deny Love's Motion to Stay. An accompanying Order shall issue.


June 9, 2021                              s/Renée Marie Bumb
Date                                     RENÉE MARIE BUMB
                                         United States District Judge